UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

Carrie Mealey and Houston Lawrence,

    Plaintiffs,                                 Case No. _____

    v.

City of Baton Rouge, Troy Lawrence, Jr.,
Murphy Paul, Sid J. Gautreaux III,
Chad Felps, Tanner Jenkins, Eno Guillot,
James Cooper, N. Dartez, Benchmark
Group, LLC, Tafari Beard, Doe Defendants 1-20,
and ABC Insurance Companies 1-10

    Defendants.

## COMPLAINT

## I.    INTRODUCTION

1.    This case is about how the Baton Rouge Police Department and the East Baton Rouge Sheriff's Office have engaged in a wide-spread pattern of illegal strip-searches, false arrests, theft of money, unconstitutional interrogation, and excessive force.

2.    These abuses took place on the streets of Baton Rouge and in at least three law enforcement black sites, including the now-notorious "BRAVE Cave."

3.    Plaintiff Carrie Mealey was a sixty-eight-year-old grandmother. Officers took her and her paraplegic son to the BRAVE Cave and interrogated them there. Later, she was subjected to a visual body cavity search.

4.    Officers subjected Plaintiff Houston Lawrence to repeated visual body cavity searches at multiple facilities, injected him with a syringe, and beat him to the point of a torn rotator cuff.

5.    These citizens now sue for accountability and justice for how they were treated.

## II.    JURISDICTION AND VENUE

6.    Plaintiffs' claims arise under the Constitution and the law of the United States. This Court

has original jurisdiction over Plaintiffs' claims of federal rights violations pursuant to 28 U.S.C. §§ 1331. This Court has supplemental jurisdiction over Plaintiff's Louisiana state law claims in accordance with 28 U.S.C. § 1367.

7.      The venue is proper in the Middle District of Louisiana under 28 U.S.C. § 1391. Defendants are located in the Middle District of Louisiana and a substantial part of the events giving rise to the claim occurred in East Baton Rouge Parish, situated in the Middle District of Louisiana.

### III.    PARTIES

*Plaintiffs*

8.      Plaintiff **Carrie Mealey** is an adult domiciled in East Baton Rouge Parish, Louisiana.

9.      Plaintiff **Houston Lawrence** is an adult domiciled in East Baton Rouge Parish, Louisiana.

*Defendants*

10.     **City of Baton Rouge / Parish of East Baton Rouge** is a government subdivision.

11.     Defendant **Troy Lawrence, Jr.** (P10805) a resident of Louisiana and was a member of the Baton Rouge Police Department at the relevant times.

12.     Defendant **Murphy Paul**, is an adult, and is sued in his individual and official capacities.

13.     At the relevant times, Paul was the Chief of the Baton Rouge Police Department.

14.     At the relevant times, Paul was the final policymaker for the municipal defendants as it pertains to official policy governing searches, seizures, training, discipline, use of force, and First Amendment policy for the Baton Rouge Police Department.

15.     **Sheriff Sid J. Gautreaux III** is the Sheriff of East Baton Rouge Parish.  He is sued in his official capacity.

16.     **Chad Felps (EBRSO)** is a resident of Louisiana and a member of the East Baton Rouge Sheriff's Office at the relevant times. He is sued in his individual capacity.

17.    **Tanner Jenkins (EBRSO)** is a resident of Louisiana and a member of the East Baton Rouge Sheriff's Office at the relevant times. He is sued in his individual capacity. He was also a member of the joint DEA task force.

18.    **Eno Guillot (EBRSO)** is a resident of Louisiana and a member of the East Baton Rouge Sheriff's Office at the relevant times. He is sued in his individual capacity.

19.    **James Cooper (EBRSO)** is a resident of Louisiana and a member of the East Baton Rouge Sheriff's Office at the relevant times. He is sued in his individual capacity.

20.    **N. Dartez (EBRSO)** is a resident of Louisiana and a member of the East Baton Rouge Sheriff's Office at the relevant times. He is sued in his individual capacity. He was also a member of the joint DEA task force.

21.    **Tafari Beard (EBRSO)** is a resident of Louisiana and a member of the East Baton Rouge Sheriff's Office at the relevant times. He is sued in his individual capacity.

22.    **Benchmark Group, LLC** is a corporation registered and doing business in Louisiana with the physical address of 11328 Pennywood Avenue, Baton Rouge, LA 70809.

23.    **Doe Defendants 1-20** are persons presently unknown to have contributed to the allegations herein after Plaintiffs' diligent search and inquiry.

24.    **Doe Defendants 1-20 are put on notice of this suit as follows**: each of them was an officer present at one of the three law enforcement black sites described herein when Plaintiffs were imprisoned, searched, and interrogated there.

25.    More specifically, each of them was a BRPD or EBRSO officer who was present:

  a.  On June 28, 2023 at the Plank Road site with Carrie Mealey;

  b.  In 2019 at the site off of Acadian Thruway, near the I-10 interstate, with Houston Lawrence;

  c.  In 2019 at the Plank Road site with Houston Lawrence;

d.   On April 21, 2022, at the Plank Road site with Houston Lawrence;

e.   On October 20, 2022 at the site off of Siegen Lane, by Industriplex Road, near the Hooters restaurant, with Houston Lawrence.

f.   All officers present for the events described in EBRSO Report Numbers 22-018032 and 22-053231.

26.     These officers' identities are known to Defendants through BRPD and EBRSO body camera footage, location data, vehicle GPS devices, and paper and electronic records.

27.     Defendant **ABC Insurance Companies 1-10** are not-yet-identified insurance companies that hold polices which cover any or all of the co-Defendants for the actions alleged herein.

28.     At all relevant times each Defendant was acting under color of state law.

## IV.     STATEMENT OF FACTS

**A.     Defendants Imprisoned and Strip Searched Sixty-Eight-Year-Old Mother and her Paraplegic in the Plank Road Torture Warehouse Known as the "BRAVE Cave."**

29.     On May 13, 2022, BRPD officers pulled Carrie Mealey's son Shermon out of his car at a gas station, and handcuffed him.

30.     Shermon is paraplegic; he is paralyzed from the waist down.

31.     Troy Lawrence, Jr. was among those officers.

32.     Officers from squad cars 1516, 1851, 1670, 1573 were also present.

33.     They placed Shermon in a rolling office chair.

34.     The officers loaded Shermon into BRPD vehicle No. 1516.

35.     In doing so, they dropped Shermon heavily to the ground.

36.     They took him to the Fourth District Precinct at 8227 Scenic Highway.

37.    They then loaded him into another vehicle and took him to the warehouse near Plank Road, also known as the BRAVE Cave which is now known to have been a black site for BRPD officers to interrogate and torture suspects.

38.    BRAVE is an acronym for "Baton Rouge Area Violence Elimination."[1]

39.    The BRAVE team was BRPD's "Street Crimes"[2] unit or "Violent Crime Enforcement Unit."[3]

40.    Ironically, the BRAVE team was supposed to spread a "No Violence Message."[4]

41.    The BRAVE team began in 2012 as Baton Rouge introduced as part of a "focused deterrence" model of crime.[5]

42.    Focused deterrence works from a purported "carrot and stick" model.[6]

43.    The BRAVE team was the "stick" in that metaphor.

44.    The BRAVE team turned into the Street Crimes unit, and further emphasized its hypermilitarized presenation.

45.    For example, this is how the Street Crimes Unit presented itself:[7]

---

[1] BRPD Intra-Divisional Procedure No. 501/96-6 at I(B)(4).
[2] BRPD General Order No. 114, pg. 9.
[3] BRPD Intra-Divisional Procedure No. 501/13-1.
[4] BRPD Intra-Divisional Procedure No. 501/13-1.
[5] https://slate.com/news-and-politics/2023/10/louisiana-police-reform-baton-rouge-torture-warehouse.html
[6] Id.
[7] https://www.youtube.com/watch?v=jSdve3hLJ9A&ab_channel=FOX



46.     In 2019, Troy Lawrence, Jr.'s father, Troy Lawrence, Sr., described the Street Crimes Unit as "the aggressive side of us," meaning BRPD.[8]

47.     In that context, the Street Crimes Unit began using a warehouse known as the Plank Road facility, or the "BRAVE Cave."

48.     The Plank Road facility is located at 2864 Shelley St, Baton Rouge, LA 70805.

49.     It was built approximately 19 years ago, and has been used by "specialized" BRPD units for about the last decade.[9]

50.     It looks like this:

---

[8] https://www.youtube.com/watch?v=jSdve3hLJ9A&ab_channel=FOX
[9] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 1:26



**Fig. 1 – 2864 Shelley Street warehouse, aka the "BRAVE Cave" aka "Plank Street Facility"**

51.     At the Plank Road facility, the officers fingerprinted Shermon.

52.     They subjected him to a strip search.

53.     They subjected him to a visual body cavity search.

54.     Because Shermon is paralyzed, he wears adult diapers.

55.     The strip search involved removing Shermon's diaper and exposing his genitalia.

56.     Shermon could not tell if the officers engaged in a penetrative cavity search, because he cannot feel below his waist.

57.     The officers interrogated Shermon at the BRAVE Cave.

58.     The officers then transported Shermon to the East Baton Rouge Parish Prison (EBRPP), where they booked him for alleged crimes.

59.     Shermon was subjected to another visual body cavity search again at EBRPP.

60.     The officers knew that Shermon would be subjected to another strip search when they booked him into EBRPP.

61.     There could not have possibly been any reason to think Shermon had weapons or contraband at EBRPP because officers had already subjected him to a prior visual body cavity search and he remained in custody until booking.

62.     Subsequently, the District Attorney no-billed every charge against Shermon.

63.     Shermon was released from EBRPP.

64.     On June 28, 2023, the officers returned, this time to Shermon's mother Carrie's home.

65.     Troy Lawrence, Jr. was among these officers.

66.     The officers used the BRPD Bearcat for the raid:



**Fig. 2 – Bearcat at Carrie Mealey's home**

67.     They told Carrie they had a warrant, although they did not show it to him.

68.     They searched the home.

69.     They removed Shermon from his wheelchair and handcuffed him.

70.     They used so much force to handcuff the compliant, half-paralyzed Shermon that they injured his wrists and arms.

71.     They then took Shermon and his 68-year-old mother to the Plank Road facility.

72.     The officers again subjected Shermon to a visual body cavity search, removing his diapers and exposing his genitalia.

73.     The officers interrogated Shermon again.

74.     The officers handcuffed Carrie so tightly that it caused her extreme pain, and welts on her wrists that lasted for months.

75.     They interrogated Carrie at the Plank Road Facility.

76.     This was described in her Prisoner Transport Record as the "Street Crimes Office."

77.     The officers then transported Shermon again to the East Baton Rouge Parish Prison, where they booked him for alleged crimes.

78.     The officers took Carrie Mealey to urgent care, and then subsequently took her to the East Baton Rouge Parish Prison, where they booked her for alleged crimes.

79.     They booked her for obstruction of justice, illegally supplying a felon with ammunition, and Illegally Supplying A Felon With A Firearm.

80.     Part of the grounds for the "obstruction of justice charge" was that Carrie Mealey went to the BRPD evidence division, and the BRPD evidence officers gave her back guns that were hers.

81.     Tafari Beard's affidavit in support of an arrest warrant notes that "the firearms should have never been released to Carrie MEALEY."

82.     But instead of filing a complaint against the BRPD officer, Beard arrested Carrie Mealey because the police gave her back her firearms.

83.     Carrie Mealey was subjected to a visual cavity search at EBRPP, involving squatting and coughing.

84.     Shermon was also subjected to a visual cavity search again at EBRPP.

85.     The District Attorney again no-billed every charge for both Shermon and Carrie.

86.     At EBRPP, Shermon asked to be cared for in the infirmary, but instead was placed in punitive lockdown solitary confinement.

**B.    BRPD and EBRSO officers repeatedly imprisoned, strip-searched, and interrogated Plaintiff Houston Lawrence in at least three Baton Rouge law enforcement Black Sites.**

87.    The BRPD and EBRSO street crimes units have repeatedly and illegally harassed Plaintiff Houston Lawrence over several years.

88.    For example, in 2019, Houston was handcuffed and placed in a vehicle by the BRPD street crimes unit.

89.    They took him to a BRPD/EBRSO Black Site off of Acadian Thruway, near the I-10 interstate.

90.    It was near the TJ Ribs at 2324 S Acadian Thruway, Baton Rouge, LA 70808.

91.    On information and belief, the facility may have been the facility located at 3055 Valley Street.

92.    At that Black Site, the BRPD street crimes unit interrogated Houston.

93.    At that Black Site, the BRPD street crimes unit took and kept U.S. currency in cash that Houston possessed.

94.    That cash was never returned to Houston or logged into evidence.

95.    Houston was released without being booked into EBRPP.

96.    Later in 2019, Houston was again handcuffed and placed in a vehicle by the BRPD street crimes unit.

97.    This time, they took him to the Plank Road Black Site.

98.    They strip searched him and interrogated him.

99.    Houston was released without being booked into EBRPP.

100.    On April 21, 2022, the officers returned again.

101.    The officers included Chad Felps and E. Guillot and others.

102.    This time they raided his home.

103.    They handcuffed Houston and secured him outside while they searched his home.

104.    While they were searching, Houston's girlfriend heard the officers say "any money you find, keep it. Free money."

105.    Houston had approximately $15,000 in cash at his home that was taken by the officers.

106.    The officers only reported seizing only $7,601.[10]

107.    Houston had surveillance cameras installed in his home, but the officers stole the SD cards from the system.

108.    The officers then took Houston to a Baton Rouge law enforcement Black Site.

109.    Troy Lawrence, Jr. (BRPD) was present.

110.    Chad Felps (EBRSO) was present.

111.    Tanner Jenkins (EBSRO) was present.

112.    On information and belief, Eno Guillot (EBRSO) was present.

113.    Houston knew that one of the officers was Troy Lawrence, Jr. because the officers pointed out that Houston and Troy have the same last name, and joked that they might be related.

114.    The officers placed a bag over Houston's head during the drive to the Black Site.

115.    In the vehicle, the officers used force on Houston and asked him questions.

116.    The internal appearance of the facility was consistent with the Plank Road Black Site.

117.    At the Plank Road Black Site, the officers strip searched Houston.

118.    They made him remove his pants and undergarments, and squat and cough while nude.

119.    They then handcuffed Houston to a table.

120.    Houston asked to speak to an attorney, but the officers refused and continued interrogating him.

---

[10] State's Response to Discovery - DC-22-03072 at 14.

121.    The officers took a syringe and used it to inject a milky white substance.

122.    The officers continued to beat Houston at the Plank Road facility.

123.    They beat Houston so badly that they cut and bruised his body, and tore his right rotator cuff.

124.    When the officers did not get the answers they wanted, they brought Houston's girlfriend to the Plank Road Facility and threatened to arrest her.

125.    The officers police report corroborates that Houston's girlfriend was "detained and placed into handcuffs."[11]

126.    The officers eventually took Houston and booked him into the East Baton Rouge Parish Prison.

127.    He was booked under Report Number 22-018032.

128.    Houston was strip-searched again at EBRPP.

129.    They did not take Houston to the hospital, despite his serious injuries.

130.    Several months later, Houston was released on bond in July 2022.

131.    On October 20, 2022, the officers returned, including Tanner Jenkins, Chad Phelps, Troy Lawrence, N. Dartez, and James Cooper.

132.    They arrested him at his apartment.

133.    Houston had $3,500 in cash with him.

134.    The officers' police report notes only $185 booked into evidence.[12]

135.    Outside his apartment, the officers pulled Houston's pants and undershorts down to his knees, exposing his genitals.

136.    They performed a strip search in the street outside Houston's home.

---

[11] State's Response to Discovery - DC-22-03072 at 14.
[12] States open file discovery-Docket #DC-22-05865 at 43.

137.    The officers took Houston to a different Black Site. This one was off of Siegen Lane, by Industriplex Road, near the Hooters restaurant.

138.    Upon information and belief, the address of this Black Site is 11328 Pennywood Avenue, Baton Rouge, LA 70809.

139.    The Pennywood Avenue location looks like this from the street:



140.    On information and belief, persons are detained in this shed-like building (red circle) in the back area of 11328 Pennywood Avenue:



141.    The property is owned and operated by Defendant Benchmark Group, LLC, who also lists 11328 Pennywood Avenue as their physical address in their business filings with the Louisiana Secretary of State.

142.    The officers' police report corroborates this transport to a Black Site, described under the euphemism of "EBRSO Narcotic office:"[13]

(10) The Defendant was later transported to the ==EBRSO Narcotic office== for a post Miranda interview. During the interview the Defendant had knowledge of the narcotics located in his apartment, but was unaware that he had any Fentanyl. The Defendant also denied any knowledge of the firearm that was located inside of his apartment. The Defendant was later transported to the EBR Parish Prison where he was booked for violating the listed statutes.

**Fig. 3 – Excerpt from Houston Lawrence police report**

143.    Notably, another description by the same officer of the same arrest leaves out any reference to the "EBRSO Narcotic office":

---

[13] States open file discovery-Docket #DC-22-05865 at 16



1
****************************OFFENSE****************************
1. On 10/20/2022 at approximately 1354 hrs the EBRSO Narcotics Division took LAWRENCE into custody as he was walking out of his apartment to his Cadillac ATS.

2. Houston LAWRENCE was later booked into EBR Parish Prison for violating the listed statutes.

3. See Supplement

**Fig. 5 – Excerpt from Houston Lawrence police report**

144.     At this Black Site, the officers again strip and visual-cavity-searched Houston. While handcuffed, they pulled his pants and undershorts down to his knees and made him squat and cough.

145.     Cooper, Tanner Jenkins, Chad Phelps, Troy Lawrence were all present for this search.

146.     Houston said "I want to speak to an attorney." But the officers continued interrogating him.

147.     Felps told him, "we need keys or a dead body."

148.     Tanner Jenkins told Houston that he was a federal agent, and that he gets paid good money to keep assholes like Houston off the street.

149.     Houston believed Jenkins that he was a federal agent.

150.     Research reveals, however, that Jenkins is an EBRSO captain who has served on the joint Drug Enforcement Administration task force:

### Narcotics



**Captain Tanner Jenkins**
**Narcotics**
13016 Gurney Road
Baton Rouge, La 70818
Phone: (225) 389-5051
Fax: (225) 389-5041
Email Narcotics

**Captain Tanner Jenkins** serves as the Commander of the Narcotics Division. He began working at EBRSO in 2007 and served in Uniform Patrol and SCAT. From 2009 to 2013 Captain Jenkins was a member of SWAT. He has worked in the Narcotics Division since 2009 and has facilitated hundreds of arrests and drug seizures. While in Narcotics he has been on both the DEA Task Force as well as the Louisiana State Police Task Force. He currently testifies as a subject matter expert in Narcotics Trafficking and the Use of Firearms in Narcotics Trafficking in Federal Court. Captain Jenkins has a Bachelor's Degree in Criminology from Arkansas State University. He also earned the recognition of EBRSO's 2011 and 2016 Detective of the Year for his efforts in stopping drug trafficking.

**Fig. 4 – Capt. Tanner Jenkins profile**

151.    After interrogating Houston, the officers took him back to EBRPP and booked him.

152.    He was booked under 22-053231.

153.    Houston was strip-searched again at EBRPP.

154.    The officers knew what they were doing was wrong.

155.    BRPD policy requires that for every strip search, the officers report and document the strip search. BRPD General Order No. 281 (III)(E).

156.    The officers did not document any of the strip or cavity searches of any plaintiff.

**C.    The strip-searches flowed from a facially-unconstitutional BRPD strip-search policy, and an inadequate EBRSO strip-search policy.**

31.    When officers have only reasonable suspicion regarding a non-arrestee, long-established law says that they may only conduct a "frisk." *Minnesota v. Dickerson*, 508 U.S. 366 (1993).

32.    But BRPD policy, General Order 281, explicitly allows officers to conduct a full strip-search <u>based on only reasonable suspicion</u>, even on non-arrestees:

> **III.   Strip Search**
>
> A.   Arrestees will not be subjected to strip searches unless the officer has articulate, reasonable suspicion that this particular arrestee may have weapons or contraband on his person. Reasonable suspicion will be based on the following factors:
>
> 1.   The nature of the offense charged.
> 2.   The arrestee's appearance and conduct.
> 3.   The circumstances of the arrest.
> 4.   The arrestee's prior record.

**Fig. 5 – Excerpt from BRPD strip search policy**

157.    BRPD even allows strip-searches of <u>non-arrestees</u> on only reasonable suspicion:

> C.   Strip searches may be conducted on non-arrestees based on individualized articulable reasonable suspicion to frisk, probable cause to search, consent, or a court order.

**Fig. 6 – Excerpt from BRPD strip search policy**

158.    The policy is explicit that a strip-search is different than a frisk.

159.    BRPD General Order No. 281 defines a frisk as a "pat down of the outer garments specifically for weapons."

160.    BRPD General Order No. 281 defines a strip search as a "visual inspection of an individual who has disrobed including the hair, mouth, ears, nostrils, groin area and buttocks to locate weapons, contraband or evidence."

161.    The fact that BRPD policy allows "**strip searches**" of non-arrestees based on "reasonable suspicion **to frisk**" is an admission that the policy goes beyond what the Constitution allows.

162.    By contrast, EBRSO's policy on searches is completely tautological.

163.    EBRSO's search and seizure policy (EBRSO Policy 311) is only two pages long.

164.    It provides no guidance whatsoever for when a strip-search is appropriate or permissible.

165.    All it says is that "All seizures by this office will comply with relevant federal and state law governing the seizure of persons and property," and that because "case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this office is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law."[14]

166.    Simply telling officers "don't break the law" without any guidance about *how* to not break the law so is tantamount to having no policy at all.

**D.    BRPD and Chief Paul's Public Endorsement of Illegal Strip Searches**

167.    In 2021, BRPD officers' use of strip searches became a national news story when video of BRPD officers' (including Troy Lawrence, Jr.) strip search of Clarence Green and his juvenile brother was broadcast on CBS Evening News.

---

[14] EBRSO Policy 311.2, 311.3.

168.    In a May 2021 press conference, Chief Murphy Paul and Deputy Chief Myron Daniels defended the officers' strip searches at a public news conference.

169.    Chief Murphy Paul, with the input of Deputy Chief Myron Daniels, cleared the officers of any wrongdoing related to the illegal strip searches depicted on the video.

170.    Chief Murphy Paul and Deputy Chief Myron ensured that BRPD officers conducted strip searches consistent with General Order No. 281's instructions that strip searches could be properly based on solely on an officer's suspicion of wrongdoing.

171.    Instead of holding those officers accountable, the City of Baton Rouge instead attempted to imprison the attorney, Professor Thomas Frampton, who publicized the misconduct.

172.    On January 7, 2022, the court granted a preliminary injunction, finding "overwhelming evidence" that the City had acted in "bad faith and in retaliation" in its attempts to jail Professor Frampton.[15]

173.    This sent a clear message to BRPD officers: if you engage in illegal strip-searches you will not be punished. Instead, we will seek to punish those who publicized your misconduct.

174.    Chief Paul knew of the BRAVE Cave for at least months before the story broke in the news.

175.    Despite his personal knowledge, Chief Paul took no steps to shut it down until the news broke.

176.    After news of the BRAVE Cave was released, Paul said "Baton Rouge, we are sorry . . . We're sorry for our failure not to discipline an officer who demonstrated unprofessional behavior and violated our code of conduct consistently, escalating incidents. We're sorry, Baton Rouge."[16]

---

[15] *Frampton v. Baton Rouge*, 21-cv-362, R. Doc. 49 at *64 (M.D. La., Jan. 7, 2022).
[16] Sosin and Khan, '*Baton Rouge, we are sorry.' A new police chief pushes for change*, Verite, October 11, 2023.

**E.    BRPD and EBRSO's Pattern of Mistreatment at Baton Rouge Black Sites**

177.    On information and belief, since 2020, BRPD's Street Crimes Unit has conducted strip searches on thousands of individuals.

178.    On August 29, 2023, Myron Daniels said he was "very familiar" with the facility, and that it allows "space" to process evidence and arrestees, and has a "holding" facility.

179.    He said there "is nothing secretive about this narcotics processing facility," and that as of the first half of 2023, "one unit within our organization has processed right about 350 individuals" and that in 2022, "there was approximately 650 people processed at this facility."[17]

180.    On information and belief, of those individuals hundreds were individuals whose detention was based solely on reasonable suspicion of wrongdoing (or less).

181.    On information and belief, hundreds of these individuals were released without formal arrest.

182.    On information and belief, EBRSO officers have engaged in at least hundreds of strip searches of persons in the field (*i.e.*, not associated with booking at EBRPP).

183.    For example, on January 9, 2023, BRPD officers including Troy Lawrence, Jr. and Officer Wallace arrested Jeremy Lee, who is 21 years old, 5'6", and weighs 125 pounds without reasonable suspicion or probable cause.

184.    Jeremy Lee yelled in pain while Lawrence and Wallace pulled down his  pants and searched him.

185.    While Mr. Lee was handcuffed and on the ground, Lawrence told him, "I'm about to beat the living crap out of you."

186.    They took Lee to the Plank Road black site.

---

[17] https://www.youtube.com/watch?v=1ERLKzkOrtY&t=8s&ab_channel=WBRZ at 6:20.



**Fig. 7 – Screenshot of Jeremy Lee from body-camera footage.**

187.     While there, they took him out of a holding cell and severely beat him.

188.     Lawrence and Wallace repeatedly punched and kicked Mr. Lee.

189.     Mr. Lee was so badly beaten that authorities at East Baton Rouge Parish Prison refused to accept him when Wallace and Lawrence attempted to transfer Mr. Lee to their custody, insisting that Mr. Lee be taken to the hospital.

190.     Mr. Lee was diagnosed with broken ribs and other physical injuries as a result of his beating.

191.     Lawrence and Wallace constructed a false police report accusing Mr. Lee of attempting to escape from the torture warehouse.

192.     Lawrence accused Mr. Lee of committing a "battery" against him, though the narrative portion of the report does not actually claim that Mr. Lee ever touched him.

193.     On Saturday June 10, 2023, BRPD officers including Troy Lawrence, Jr. stopped Ms. Ternell Brown and her husband. They searched her car without consent or warrant. They found

prescription medication that Ms. Brown was in lawful possession of. They forcibly took her to the Plank Road BRAVE Cave, where they subjected her to strip and body cavity searches.

194.    Lawrence and the other officers forced her to spread her vagina and buttocks for inspection and examined her vagina using a flashlight.

195.    They released Ms. Brown without charge.

196.    BRPD Chief Murphy Paul personally received a complaint regarding the torture warehouse and Wallace/Lawrence's misconduct in January 2023; a second Internal Affairs complaint was received in April 2023.

197.    It was only when the *public* learned of these allegations in September 2023 that the torture warehouse was shuttered and Lawrence was forced out of BRPD.

**F.    BRPD's Dishonesty About Its Knowledge of the BRPD Black Sites**

198.    At a press conference on August 29, 2023, called to address the allegations that the Street Crimes Unit ran a "torture warehouse," Myron Daniels offered a false and misleading timeline regarding his and Chief Paul's knowledge about the allegations.

199.    He also falsely claimed that there was "nothing secretive" about the torture warehouse (though, ironically, Daniels kept secret his own longstanding knowledge of allegations of wrongdoing there, and also simultaneously claimed that the Street Crimes Unit officers secretly called the facility "the BRAVE Cave," unbeknownst to him or Chief Paul).

200.    Daniels stated: "Just some notes and a timeline as far as, uh, some of the things that have recently occurred. We recently received a complaint involving one of the officers associated with that case. That complaint came in as early as August 11. It was followed up by the supervisor who took the

complaint on August 13. That supervisor wrote a letter to Internal Affairs to have that case investigated."[18]

201.    In fact, the complaint regarding torture by Troy Lawrence, Jr. and other members of the Street Crimes Unit at "the BRAVE Cave" were received by Chief Paul personally in January 2023 and by Internal Affairs in April 2023.

202.    At the same press conference, Chief Paul admitted that BRPD received the BRAVE Cave complaint on April 25, 2023.[19]

203.    But Chief Paul said that the formal investigation into the BRAVE Cave was not initiated until August 28, 2023.[20]

204.    That is to say, Chief Paul was personally informed about the BRAVE Cave months before Carrie Mealey was taken there.

205.    He took no action until months later.

206.    On August 31, 2023, Mayor Weston Broome announced the closure of the facility and the disbanding of the street crimes units.

207.    On September 27, 2023, Chief Paul described the BRAVE Cave in benign terms: as a "narcotics processing center" that was "used by specialized divisions like narcotics and street crimes unit as a processing room for prisoner processing, paperwork writing, and packaging evidence after arrests."[21]

208.    He said there is a "digital watchdog" system that records from nine cameras at the facility.[22]

---

[18] https://www.youtube.com/watch?v=1ERLKzkOrtY&t=8s&ab_channel=WBRZ
[19] https://www.youtube.com/watch?v=1ERLKzkOrtY&t=8s&ab_channel=WBRZ at 12:35.
[20] batonrougela-2023-09-27-Metropolitan_Council-808-6597
[21] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 2:24.
[22] Id.

209.    He said there were nine internal affairs investigations and four criminal investigations ongoing related to the facility.

210.    At that meeting, Chief Paul acknowledged that the problems with the Street Crime unit were not one individual, but the "patterns and practices" of that unit.[23]

211.    Paul said that "unfortunately, we have dealt with a matter like this before."[24]

212.    At the same meeting, Mayor Weston Broome said she was aware of "elements within the institution [BRPD] which focus on excessive force."[25]

213.    At that meeting, Paul revealed that Troy Lawrence Jr. was transferred to Street Crimes by his father, Troy Lawrence Sr.[26]

214.    When pressed about why an officer with Troy Jr.'s disciplinary history would be put in a specialized unit, Paul said "mistakes were made."[27]

215.    One council member said Troy Jr. "has been a repeated bad actor, and he has stayed on our police force."[28]

**G.    BRPD Chiefs of Police Explicitly Interfered with Attempts at Accountability, Resulting in a Systemic Breakdown of Police Discipline.**

216.    BRPD's system of accountability for its officers long has been and is currently now completely broken.

217.    In September of 2005, the population of Baton Rouge swelled as many residents of New Orleans, a majority Black city, sought refuge from Hurricane Katrina and the resultant flood. The Michigan State Police and New Mexico State Police both sent troopers to assist the BRPD in policing the city's rapidly growing population.

---

[23] Id at 1:01:40.
[24] Id. at 6:08
[25] Id. at 10:11.
[26] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 1:27:30
[27] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 1:28:50.
[28] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 1:30:30.

218.    Within three days of the troopers' arrival, both state police agencies had ordered their troopers to cease operations with BRPD after the troopers witnessed and complained of egregious misconduct and potentially criminal actions by BRPD officers.  One state trooper from Michigan said Baton Rouge police attempted to thank him for his help by letting him "beat down" a prisoner.[29] A spokeswoman for the Michigan State Police told a reporter that "troopers observed Baton Rouge police officers engage in actions that were an affront to their sense of dignity and respect."

219.    Members of both the Michigan State Police and the New Mexico State Police shared observations and concerns that were compiled in a formal letter of complaint to the BRPD. One Trooper reported that "I personally believe that most of the Baton Rouge Police Department are good officers that are being directed by their supervisors to crack down on the public. I don't know if they have been given any type of direction as to what is right or wrong."[30]

220.    No discipline was taken against these officers.

221.    As writer Jarvis DeBerry put it: "So that's what we're dealing with: a police department whose behavior worried other law enforcement officials and whose leadership has been more defensive than responsive to the claims of racist policing."[31]

222.    Examples of reported BRPD misconduct has included multiple instances of excessive force, including force directed at minors, through the use of tasering, hitting, choking, and pepper spraying of residents, without warning or threat to the safety of officers or civilians; searches of individuals and their vehicles without reasonable suspicion or probable cause; and possibly falsifying information in police reports.

---

[29] Jarvis DeBerry, *Before killing Alton Sterling, Baton Rouge police had a history of brutality complaints,* The Times-Picayune, July 6, 2016.
[30] *Id.* at 9.
[31] DeBerry, *supra.*

223.     The Baton Rouge Police Department, under the direction of Mayor Holden and predecessors in office of Chief Dabadie, also resisted efforts of media and public interest advocates to gain information regarding these post-Katrina abuses, as part of an ongoing effort to cover up and conceal officer misconduct, and to promote the police code of silence.

224.     In 2006, as part of the effort to cover up and conceal allegations of officer misconduct and to promote the police code of silence, the City/Parish and the BRPD actively resisted public records requests and a Public Records Law enforcement action filed by The Advocate newspaper seeking access to the Internal Affairs Division investigative report. Dabadie's predecessor in office authorized a meritless countersuit to delay and thereby shield investigation records from public view, while imposing high costs on the newspaper.

225.     In 2011, then-BRPD Chief Dewayne White publicly stated that ten percent of the department's officers failed to exercise basic levels of professionalism, and that "it's become so ingrained" in the minds of some officers that they "believe that everybody they come across or most people they come across with that color of skin is probably a criminal." Defendant Mayor Holden fired Chief White in 2013 and hired Dabadie in his place.

226.     In September 2014, a series of racist text messages sent by a BRPD officer to a civilian were published.  In the messages, the officer, a fifteen-year veteran of the department, referred both to Black colleagues and civilians with racial epithets, and stated, *inter alia*, "I wish someone would pull a Ferguson on them and take them out. I hate looking at those African monkeys at work . . . I enjoy arresting those thugs with their saggy pants."

227.     The officer was placed on administrative leave by BRPD and resigned before any disciplinary action was taken against him by the Department. On information and belief, no action was taken by Holden, Dabadie or the City/Parish to determine the extent of similar attitudes among other BRPD officers.

228.    Dabadie stated publicly that there was no need to do so, because the issue was confined to the lone officer. Dabadie's conclusion is belied by more recent stories, including reporting that a White BRPD officer texted his colleagues a picture of a chimpanzee and the phrase "chimp out" in the context of the Alton Sterling protests.[32]

229.    BRPD has also had a policy, practice, or custom of excessive use of force. Recent allegations include:

(a) a 2007 arrest on a complaint of "loud music" with pepper spray and force that caused the rupture of the arrestee's bladder;

(b) a 2008 arrest for smoking marijuana that fractured the skull of the arrestee causing internal bleeding and permanent brain damage;

(c) a 2011 incident in which an officer instructed a man, who advised the officer he was intoxicated, to move a vehicle away from the scene of the arrest; when the drunk driver crashed the car, the officer shot him to death and shot a bystander in the arm;

(d) a 2014 incident in which BRPD officers strip-searched a visitor to a home which was being searched by the officers, then kicked the visitor with such force that his head slammed into the floor, knocking several teeth out of his mouth;

(e) a 2015 incident in which two members of the news media were handcuffed, and one arrested, for taking pictures of an arrest;

(f) a 2016 incident caught on video in which a sixteen-year-old was held down by multiple officers while one officer repeatedly punched him in the head;[33] and

(g) the shooting death of Alton Sterling in July 2016.[34]

230.    The BRAVE team's abuses followed in a long history of BRPD officers forming units called "jump out boys" who engaged in illegal searches, seizures, and uses of force on Baton Rouge citizens.

231.    For example, BRPD officer Christopher Taylor testified that "jump out boys"

---

[32] Jim Mustian, *Baton Rouge Officer suspended after alleged racial message about Alton Sterling protests*, The Advocate, May 22, 2017.
[33] DeBerry, *supra.*
[34] *See Andricka Williams v. The City of Baton Rouge*, 19th Judicial District Court.

referred to BRPD's "criminal patrol unit."[35]

232.     In recent years, suits against the City/Parish for BRPD's excessive uses of force and unconstitutional arrests have resulted in sizeable yearly settlements by the Parish Attorney. For example, the City/Parish paid $372,434 to settle such cases in 2015, $581,286 in 2014, and $437,112 in 2011.

233.     Similar to BRPD, the East Baton Rouge Sheriff's Office has its own history, extending decades before the July 2016 protests, of excessive force and unconstitutional arrests. More recently, allegations of excessive force and unconstitutional arrest leveled against EBRSO and Defendant Gautreaux have included multiple instances of excessive force through the inappropriate use of tasers, unconstitutional use of mace, and punching and kicking arrestees without justification.   Some of these allegations are documented in the following cases: *Davis v. East Baton Rouge Sheriff's Office*, Civil Case No. 08-00708 (M.D. La.) (resolved in private settlement); *Martinez v. Gautreaux*, Civil Case No. 10-00847 (M.D. La.) (resolved in a private settlement); *Plaisance v. East Baton Rouge Sheriff's Office*, Civil Case No. 16-00365 (M.D. La.).

234.     These abuses resulted from a systemic failure of accountability in BRPD and EBRSO.

235.     When Dabadie left BRPD, he was hired at EBRSO.

236.     Carl Dunn, a retired BRPD deputy chief who is now police chief in the nearby city of Baker, says that before "Murphy Paul, the running joke — all over the state of Louisiana — was that the Baton Rouge Police Department didn't have an Internal Affairs."[36]

237.     According to Dunn, internal affairs "didn't exist before [Paul]. There was no

---

[35] Taylor Deposition at 24:3-23.
[36] Sosin and Khan, *'Baton Rouge, we are sorry.' A new police chief pushes for change*, Verite, October 11, 2023.

accountability, none."[37]

238.    "There wasn't really a need for them (officers) to come out and take revenge on people that file complaints because the complaint didn't go anywhere anyway," he said. "It was going to be unsustained anyway."[38]

239.    Dunn, who retired from the department in 2015 and now is the police chief in the nearby city of Baker, said that, on some occasions, Internal Affairs officers would coach the officers accused of improper use of force off the record on what to say before the formal interview.[39]

240.    "Man, if you just knew how many people were told, 'Who you think we going to believe? You? Or the sworn police officer? That leaves his loved ones at home and come out here and try to save the world,'" he said. "'Who you think we're going to believe? Do you really want to file this complaint?'"[40]

241.    "There was a culture where the officers, both Black and white, in the police department, could basically do anything they wanted on the streets with no consequence to the citizens, Black or white," said Chauna Banks, a Baton Rouge Metro Council member.[41]

242.    This culture of impunity resulted in mass constitutional violations.

243.    For example, in 2016, in response to BRPD misconduct, thousands of Louisiana residents protested BRPD in 2016.  BRPD responded with mass arrests of the protesters.

244.    BRPD engaged in hundreds of arrests, hundreds of uses of excessive force, and hundreds of examples of falsification of perjured affidavits of probable cause.

---

[37] *Id.*
[38] *Id.*
[39] Sosin and Khan, *'No further action taken': Who is policing the police?,* Verite, April 17, 2023.
[40] *Id.*
[41] Sosin and Khan, 'No further action taken': Who is policing the police?, Verite, April 17, 2023.

245.    Even though the streets had already been cleared,[42]   BRPD officer David

Wallace then gave an order over the interop radio channel to execute mass arrests: "Everyone

has violated. Everyone is under arrest. Those who can safely apprehend violators must do so."[43]

246.    Law enforcement followed the BRPD order that "everyone" was under arrest.

They swept in and began making mass arrests of protesters on private property and the curb.[44]

BRPD officers went "into the yard and beg[a]n making detentions."[45] Protesters were arrested

even though the "vast majority of people were on private property" and were "outside of the

public passages."[46] The "whole yard was cleared of protesters,"[47] even though BRPD had no

"reason think that those protesters standing on private property at East and France Street did not

have permission to be there."[48] Even those protesters who were trying to disperse, as Defendants

ordered them to do, were arrested.[49]

247.    Then-BRPD-Chief Dabadie explicitly shielded the BRPD response from

Internal Affairs investigation by telling all IA investigators to "stay in the office."

248.    Sgt. Beard testified that "Every member of my office was advised to stay in the

---

[42]*Imani*, Plaintiff's MSJ, Ex. S at 90:5-9 ("Q. . .  This is a situation where the streets are cleared, and then the troopers move forward, agree? A. There is nobody in the street. I would agree to that, yes, sir.")

[43] *Imani*, Plaintiff's MSJ, Ex. U at 144:8-18 ("Q. Just to repeat what it sounded to me like he said, it was, You've got one of the leaders requesting to walk on the sidewalk past France. Someone else responds, It's too late. Then 10-9. Then responds, Too late. Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so. Primary targets are the white male, red hair, tie-dyed shirt, and everyone else who is violating, which is everybody out there. Does that sound about right? A. Yes, sir.")

[44] See Ex. J at 83:18-84:1 (Dohm) (protesters were arrested in private property and on the sidewalks)

[45] Ex. CC at 90:1-7.

[46] Ex. V at 122:16-19 ("Q The vast majority of people were on private property, though; is that accurate? A Yes, they were outside of the public passages, yes.")

[47] Ex. CC at 90;4-7.

[48] Ex. Y (30b6 Witness Dep.) at 186:23-187:2.

[49] *North Baton Rouge Matters v. City of Baton Rouge*, M.D. La. 16-cv00463-JWD-RLB ("NRBM"), R. Doc. 2-8 at 3 (Affidavit of Legal Observer McDaniel) (protester attempted to leave, and told an officer "that he needed to get to his car to go to work. As he walked to his car, police officers arrested him."); *id*., R. Doc. 2-9 at 13 (Aff. of Legal Observer Lily Ann Ritter) ("I also heard police officers tell people that they needed to disperse several times. However, police were blocking all surrounding intersections and there was nowhere for people to go. Protesters who wanted to leave were not able to do so."

office. No Internal Affairs investigators were at any protests. We were all given an order to remain in our office."[50] He said this order would have been given by Chief Dabadie.[51]

249.     Lawsuits followed, which uncovered abundant evidence of BRPD misconduct, ranging from unreported uses of force, to orders to engage in mass arrests of protesters, to admissions of forged signatures on sworn documents.

250.     The evidence of misconduct was so strong that the City of Baton Rouge settled one case during trial for $1.17 million.[52] Other lawsuits stemming from those protests are still ongoing.

251.     Despite the strength of that evidence, BRPD's Internal Affairs department never conducted any investigation into any officer conduct related to the protests, with one exception.[53]

252.     That exception was that BRPD Internal Affairs investigated one officer for saying that BRPD was "violating peoples' rights, wrongfully arresting them."[54]

253.     During litigation, BRPD did not open investigations into its officers, even after they repeatedly refused to answer questions on the grounds that their answers might incriminate them in a crime.

254.     For example, Officer Jonathan Abadie plead the Fifth to a range of questions including:

- "[W]hen you signed your name to this document under oath, swearing as to the truth of the contents of it, were you lying?"[55]

---

[50] *Imani v. Baton Rouge*, 17-cv-439, R. Doc. 291, Ex. Y at pg. 64.
[51] *Id.*
[52] https://www.law360.com/access-to-justice/articles/1577517/how-baton-rouge-activists-won-a-rare-civil-rights-settlement
[53] *Imani v. Baton Rouge*, 17-cv-439, R. Doc. 291, Ex. E at 14:19-25 ("Q So we can conclude that there were no -- Internal Affairs had no reports of violations or investigations of any Baton Rouge police officers other than that one accountability form we looked at in the Marcus Thompson investigation. Agreed? A Agreed.")
[54] *Imani v. Baton Rouge,* 17-cv-439, R. Doc. 291, Ex. F at 2.
[55] *Id.* at 46:13-47:3.

- "[W]hen you signed this document under oath, swearing as to the truth of the contents of it, were you committing perjury?"[56]

- "[W]hen you signed this affidavit under oath, swearing as to the truth of its contents, were you manufacturing false evidence?"[57]

- "[W]hen you signed this document under oath, swearing to the truth of the contents of it and then that document you knew would be used to imprison Samantha Nichols at East Baton Rouge Parish Prison, were you committing false imprisonment?"[58]

255.    No investigation into Abadie was opened.

256.    Even when multiple officers reported to their chain of command that some officer was forging their names on affidavits of probable cause, BRPD did not conduct any investigation.

257.    At trial, BRPD representatives said that Internal Affairs never conducted any investigation because there was no citizen complaint.

258.    On May 15, 2023, however, a citizen complaint was filed. It was directed to Chief Paul, and contained evidence and testimony that:

- BRPD officers signed pre-written affidavits of probable cause under oath, even though they knew the contents were false;

- BRPD officers' signatures were repeatedly forged;

- BRPD officers ordered the mass arrest of protesters who were complying with police directions;

- BRPD applied its "Civil Disorder" policy to protesters "because of the content of their speech";

- BRPD officers violated policy by failing to file use of force reports;

- BRPD officers admitted they were "messing around" with an untested, untrained weapon system when they used it an protesters; and

---

[56] *Id*. at 47:5-17.
[57] *Id*. at 47:18-48-5.
[58] *Id*. at 48:6-20.

- Then-Chief Dabadie ordered all internal affairs investigators to "stay in the office.

259.    Chief Paul was subjectively aware of the complaint, because he called the author on the phone to discuss it.

260.    He did not, however, authorize any investigation whatsoever.

261.    He refused to have BRPD investigate the matter even though according to BRPD materials, an "investigation will be conducted in all citizen complaints involving employees of the BRPD."[59] And "[g]rievances will be thoroughly and impartially handled."[60]

262.    An investigation by Verite News found that between 2009 and 2018, Internal Affairs ruled 86% of the 308 use-of-force complaints investigated as "exonerated" or "not sustained."[61]

263.    In 2017, that number rose to 100%, according to the department's data.[62]

264.    A retired New York Police Department official, who worked in the NYPD's internal affairs bureau, said after seeing the data from 2017 that a year without a single sustained internal investigation into use of force is almost statistically impossible, no matter the department.[63]

265.    Under this absence of accountability or discipline, officers engaged in a pattern of misconduct just like what happened to Plaintiffs.

266.    For example, BRPD Officer Jeremiah Ardoin explained that narcotics officers had a verbal policy requiring a quota of arrests.

267.    The quota was enforced by taking away officers' overtime.

---

[59] https://www.brla.gov/1821/File-a-Complaint
[60] *Id.*
[61] '*Baton Rouge, we are sorry*", supra.
[62] Id.
[63] Sosin and Khan, '*No further action taken': Who is policing the police?*, Verite, April 17, 2023.

268.    "At least three to four nights a week they would have us riding through the neighborhoods," Ardoin said. "If you saw a random black person walking around the street and hasn't done anything, they would tell us just to jump out the vehicle, grab them and pat them down without probable cause. I voiced my opinions several times, and I didn't agree with that."[64]

269.    "We normally ride two people to a vehicle and each person had to have one arrest before the end of the shift," Ardoin said.

270.    According to Ardoin, at least one colleague would openly brag about "planting drugs" on people.[65]

271.    He would brag that "search warrant is never dry if he brings his own supply."[66]

272.    Ardoin wrote a memorandum detailing some of the problems he saw, such as stops without reasonable suspicion: "For instance, if a black male was seen walking in the street, they would instruct us to contact him and pat him down," Ardoin wrote.[67]

273.    But the absence of accountability continued after Murphy Paul was appointed chief.

274.    Paul was appointed Chief in January 2018.

275.    In 2018, now-Deputy Chief Myron Daniels (then Internal Affairs Commander) personally shut down a meritorious Internal Affairs investigation into wrongdoing by Lorenzo Coleman, who was tasked with running the Street Crimes Unit.

---

[64] Chris Nakamoto, *BRPD Narcotics officer exposes wrongdoing, coverups and quotas in bombshell interview with Nakamoto*. WBRZ  April 28, 2021.
[65] *Id*.
[66] *Id*.
[67] Skene, *Alleged corruption in BRPD narcotics unit includes stolen drugs, illegal searches, planted evidence,* Advocate March 5, 2021.

276.    Deputy Chief Myron Daniels and Street Crimes Unit head Lorenzo Coleman operate a consulting group doing business as "Armor Consulting Group" (ACG) from which they gain additional income.

277.    Daniels holds himself out at the "President" of the organization; Coleman holds himself out as the "Chief Operating Officer."



**Fig. 8 – Screenshots from Armor Consulting Group**

278.    Daniels was promoted to become Paul's Deputy Chief and Chief of Staff in 2020.

279.    Because he has a business partnership with Coleman and because the two men share an interest in maintaining their reputation as police reformers, Daniels should have recused himself from an Internal Affairs or misconduct investigation into the Street Crimes Unit that Coleman oversaw.

280.    But Daniels has never recused himself from any Internal Affairs or misconduct investigation into wrongdoing by Coleman, the Street Crimes Unit, or individual officers associated with the Street Crimes Unit.

281.    Daniels remains involved in overseeing the investigation into Coleman, the Street Crimes Unit, and "the BRAVE Cave" to this day, despite the fact that Street Crimes Unit operations there were run by his business partner, Lorenzo Coleman.

**H.    Wrongful Retention of Troy Lawrence, Jr.**

282.    During Troy Lawrence Jr.'s short tenure as a BRPD officer, his dangerous temper led to

numerous Internal Affairs investigations.

283.    Numerous incidents have involved Troy Lawrence Jr. needless escalating ordinary encounters, strip-searching Black citizens, and responding to criticism with violence.

284.    Troy Lawrence, Jr. is the son of BRPD Deputy Chief Troy Lawrence, Sr.

285.    Apart from Chief Murphy Paul, Deputy Chief Troy Lawrence Sr., was the highest paid employee of BRPD.

286.    No BRPD employee with Troy Lawrence Jr.'s seniority has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr.

287.    No BRPD employee has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr. in the previous two years.

288.    For example, shortly after joining the force, Ofc. Lawrence's misconduct made national news when he strip-searched a minor child in public; illegally searched that child's mother's apartment without a warrant; and then threated to beat a handcuffed detainee.

289.    On December 29, 2020, Judge Brian A. Jackson (who was unaware of the threatened beating) described the incident as follows: "[T]he state agents in this case demonstrated a serious and wanton disregard for Defendant's constitutional rights, first by initiating a traffic stop on the thinnest of pretext, and then by haphazardly invading Defendant's home (weapons drawn) to conduct an unjustified, warrantless search. Such an intrusion, in abject violation of the protections afforded by the Fourth Amendment of the United States Constitution, which protects citizens against unwarranted governmental intrusions in their homes, may justifiably be considered to be a trespass subject to prosecution under La. R.S. 14:63."[68]

290.    The Court went on to explain that at the suppression hearing, Lawrence gave "multiple

---

[68] *USA v. Green*, 20-cr-00046, R. Doc. 35 at fn. 1 (M.D. La. Dec. 29, 2020).

conflicting accounts when describing the circumstances leading up to Defendant's traffic stop, and failed to offer a satisfactory explanation for why the police reports in this investigation were revised nearly one *dozen* times in the months following Defendant's arrest."[69]

291.    After the home search, when BRPD officers attempted to pressure Ms. Green into consenting to allow them to take a DNA sample from her minor child, Clarence Green (from the back of a police car) advised his mother to call a lawyer.

292.    Troy Lawrence Jr. then threatened to beat Clarence Green while he was handcuffed and locked in the back of a police car, stating: "If you don't shut the fuck up, I'm gonna come in and I'm gonna fuck you up. You think I'm playing with you? I will fuck you up."

293.    Despite that incident and that ruling, BRPD retained Lawrence on the force.

294.    Despite Judge Jackson's ruling on December 29, 2020, the filing of a civil rights lawsuit on January 2, 2021, and Baton Rouge Metropolitan Council's ratification of a $35,000 settlement on April 2021, no disciplinary investigation into Ofc. Lawrence was even *started* until (at earliest) May 24, 2021.

295.    On May 28, 2021, Deputy Chief Myron Daniels and Chief Murphy Paul convened a press conference to address the national controversy caused by Troy Lawrence, Jr. and his colleagues.

296.    At the press conference, the first question posed by journalists was: "This happened almost 17 months ago. Would we be here talking about this today if that video had not come out?" Chief Paul responded: "Absolutely we would have.  We just had the last hearing, what was it, the 13th I believe? The 13th of this month was our last hearing. And we still have two other officers that we have not completed that investigative process. So yes, we still would have made that information available to the public once those administrative processes have concluded."

---

[69] *Id.*

297.    Chief Paul omitted that the investigation into Ofc. Lawrence was not started before May 24, 2021.

298.    BRPD conducted an investigation into Troy Lawrence Jr.'s role in the Green Family case and Chief Paul and Deputy Chief Daniels personally reviewed the results.

299.    BRPD cleared Lawrence of any violation of a "use of force" or search-and-seizure policies in connection with the initial stop of, initial search of, and threatened violence against Clarence Green and his brother.

300.    As Chief Paul stated at the press conference, the strip-searches conducted of Green and his brother were consistent with and approved under BRPD policy.

301.    Ofc. Lawrence also used force and violence against another motorist, Shermanie Reed, who (correctly) told him he was acting unprofessionally on October 31, 2020.

302.    Ofc. Lawrence grossly misrepresented the details of the encounter in a police report (and subsequent Internal Affairs investigation). Though Internal Affairs knew or should have known that Lawrence lied throughout his Internal Affairs investigation, no action was taken against him for his obvious lies.

303.    BRPD conducted an investigation into the case and Chief Paul personally reviewed the results.

304.    Ofc. Lawrence's interview with Internal Affairs included numerous obvious false statements.

305.    The investigation cleared Ofc. Lawrence of all wrongdoing in that case apart from muting his body-worn camera.

306.    In September 2021, counsel for Ms. Reed wrote Parish Attorney Andy Dotson to alert him to Lawrence's misconduct and to highlight misrepresentations in his Internal Affairs interview. The letter sought a meeting with Chief Paul regarding the incident.

307.    Andy Dotson did not respond.

308.    Reed sued Lawrence and Chief Paul for false arrest, excessive force, and First Amendment retaliation on October 30, 2021.

309.    Her complaint emphasized that Ofc. Troy Lawrence already "boast[ed] a lengthy record of professional misconduct during his short career."

310.    In numerous conversations in late 2021 and early 2022, BRPD's attorney was advised by Reed's counsel that Lawrence was likely to maim or seriously injure someone in a future incident if they failed to intervene.

311.    Neither Wallace nor Lawrence were retrained or disciplined following the beating of Jeremy Lee in January 2023; no officer was disciplined for the beating of Jeremy Lee in violation of BRPD Policy Manual General Order No.3:19, 3:20, 22, 23[3]; and no BRPD officer was disciplined for failure to follow BRPD Policy Manual General Order No. 135[4] as it relates to record of Jeremy Lee's medical treatment.

312.    At Lawrence's deposition on January 19, 2023, he repeatedly lied about the facts of the case.

313.    On January 21, 2023, BRPD's counsel was sent another letter highlighting examples of Ofc. Lawrence's perjury in his deposition and reiterating counsel's ongoing concerns: "Officer Lawrence is going to seriously injure or kill someone if he remains on the force. It is disheartening to learn that, since the filing of this lawsuit, Officer Lawrence has been *suspended* at least three (3) additional times for on-the-job misconduct and is currently the subject of an internal investigation for additional police brutality in December 2022."

314.    Within two months of Ofc. Lawrence's deposition, BRPD agreed to a $55,000 settlement to resolve the claims arising from that incident.

315.    Ms. Reed was willing to settle for $40,000 and an apology, but Lawrence and BRPD refused to authorize the settlement.

316.    Both Lawrence and BRPD still maintain that Lawrence did nothing wrong apart from muting his body-worn camera during his encounter with Ms. Reed.

317.    Ofc. Lawrence received no additional training, counseling, or anger management in connection with this incident.

318.    Ofc. Lawrence has twice been the subject of Internal Affair investigations for altercations with a 20-year veteran of BRPD, Cody Gunter.

319.    On July 19, 2021, Ofc. Lawrence disregarded a direct order from Sgt. Gunter, telling him, "I don't give a fuck who you are."

320.    On March 6, 2022, Ofc. Lawrence called Sgt. Gunter "a pedophile" and attempted to fight him in public.

321.    Ofc. Lawrence stated, "I'll fuck you up right here in front of everybody."

322.    Ofc. Lawrence then took off his vest and attempted to fight Sgt. Gunter, who walked away to deescalate the situation.

323.    Ofc. Lawrence then called Sgt. Gunter "a pussy" a told him that he was going to "kick [his] ass."

324.    Under oath, Sgt. Gunter explained to Internal Affairs that he believed Ofc.

Lawrence was dangerous and that he did not want to work in his presence.

```
issue with me."


~Do you have any personal vendettas against Ofc. Lawrence?
██████████  replied, "No."


~Is there any reason that you feel you cannot work with or
in the presence of Ofc. Lawrence and if so, please explain?
██████████  replied, "I would not be comfortable working in
the presence of Ofc. Lawrence because I don't know what he
is capable of.  I feel that he has a lot anger towards me
and it's not going away."
```
**Fig. 9 – Internal Affairs screenshot**

325.  He expressed his fear: "I don't know what he is capable of."

326.  On December 22, 2022, local television station reported a story entitled "BRPD Opens Internal Investigation after Cell Phone Video Captures Violent Confrontation."[70] The video in question depicts Lawrence repeatedly striking a handcuffed individual in the back of a police car while Wallace attempts to force his way into a house without a warrant.

327.  Officer Lawrence was retained on the force even after this.

328.  Time and again, BRPD has been warned in 2020 and 2021 and 2022 that by keeping Ofc. Troy Lawrence Jr. on the force, they were all but guaranteeing that a Baton Rouge citizen would be killed or seriously injured.

329.  BRPD's deliberate indifference to those warnings caused Plaintiffs injuries.

---

[70]See   https://www.wbrz.com/news/brpd-opens-internal-investigation-after-cell-phone-video-captures-violent-confrontation/ (last accessed Sept. 17, 2023).

330.    When questioned about the incident under oath on January 19, 2023, Ofc. Troy Lawrence Jr. claimed to have no recollection of the incident and no knowledge of any Internal Affairs investigation into the incident. He also claimed to have no idea who the man forcing his way into the house (his partner, Wallace) was.

331.    Daniels personally cleared Lawrence and Wallace of wrongdoing connected to the incident.

332.    BRPD retained Lawrence on the force after this incident.

333.    In yet another recent incident, Ofc. Lawrence publicly attacked two young Black citizens and their mother after they (correctly) criticized him for acting unprofessionally.

334.    On October 8, 2022, Ofc. Lawrence picked a fight with two young men— Holden Sanders and Emanuel Chavis—after BRPD officers shot their cousin, Malik Chavis.

335.    Ofc. Lawrence profanely ordered the men to leave the grounds of a hospital.

336.    When the men informed him that he was acting unprofessionally, he physically attacked them both.

337.    The assault involved grabbing Holden Sanders by the neck and hair, as Ofc. Lawrence unsuccessfully sought to rip him out of his car. He also physically attacked their mother.

338.    Ofc. Lawrence sadistically placed extremely tight handcuffs on Emanuel Chavis, and in response to his repeated requests to loosen the cuffs, responded: "Well, whenever you fight with me . . . that's what happens."

339.    BRPD retained Lawrence on the force after this incident.

340.    BRPD claims to have placed Troy Lawrence Jr. in an "Early Intervention System."

341.    He was placed in the "Early Intervention System" in response to media inquiries.

342.   On information and belief, the BRPD "Early Intervention System" has only ever had two officers in it – Troy Lawrence Jr. and one other.

343.   Sheriff Gautreaux has similarly tolerated excessive force, false statements, and other misconduct from his deputies.

344.   Take, for example, Demarcus Braxton. Sheriff Gautreaux has retained Braxton on the EBRSO force despite a history of abuse of prisoners, excessive force, false statements, and other misconduct.

345.   Braxton was first written-up on July 16, 2009 for being "caught sleeping" while he was supposed to be guarding an inmate.[71]

346.   A five-day suspension with loss of extra duty detail privileges was initially recommended, which another ranking officer recommended be increased to ten days suspension "due to the seriousness of the offense."[72]

347.   Braxton was suspended for ten days for Neglect of Duty.[73]

348.   Sheriff Gautreaux retained Braxton on the force, despite Braxton sleeping on the job.

349.   On January 11, 2012, Braxton was found to have violated EBRSO policy about Conduct Unbecoming, Treatment of Prisoners in Custody, and Use of Force.[74]

350.   EBRSO specifically found that Braxton "utilized physical force on an inmate which was without cause."[75]

351.   The incident involved Braxton's treatment of an inmate he accused of masturbating.

---

[71] EBRSO_000293.
[72] EBRSO_000292.
[73] EBRSO_000290.
[74] EBRSO_000269.
[75] EBRSO_000269.

352.    Specifically, Braxton repeatedly kicked and punched a handcuffed inmate who was laying on the ground in a fetal position, begging not to be struck.

353.    According to witnessing officer Deputy Collins: "Dy. Braxton went on A-Wing and pulled [the inmate] out by the East End control cage in handcuffs. Dy. Braxton began to ask [the inmate] did he masturbate on the nurse, [the inmate] said no. Dy. Braxton began to strike [the inmate] in the face and the back of his head several times while holding him by his jumper. [The inmate] continued to beg Dy. Braxton not to hit him and saying he was sorry. Dy. Braxton continued to strike him. [The inmate] attempted to defend himself while in restraints. Dy. Braxton knocked him to the ground and began to kick him and punch him while [the inmate] layed on the ground in a fetal position."[76]

354.    Captain Johnny Scott, who investigated, concluded that "Braxton hit and slammed the inmate to the floor without cause."[77]

355.    A ranking officer recommended an increase from a five-day suspension to a seven-day suspension "[d]ue to the seriousness of the offense and the number of rules violated."[78]

356.    Sheriff Gautreaux retained Braxton on the force, despite Braxton kicking and punching a handcuffed inmate who was lying on the ground in a fetal position and begging not to be hit.

357.    On February 11, 2013, Braxton was found to have violated policy again, specifically Performance of Duty, Neglect of Duty, and Unsatisfactory Performance.[79]

358.    The policy violation arose from Braxton's failure to properly secure inmates, which resulted in an act of violence. Captain Bell reported that "Had deputy Braxton moved the inmate to the front of the control cage when he moved there, this incident could have been avoided. However Deputy

---

[76] EBRSO_000274.
[77] EBRSO_000270.
[78] EBRSO_000269.
[79] EBRSO_000255.

Braxton did not and allowed this incident to take place."[80]

359.    Braxton was suspended for two days.[81]

360.    On May 27, 2015, Braxton was suspended again for two days, for violating EBRSO policy on Reporting for Duty.[82]

361.    In June 2015, Braxton was suspended for two days for violating EBRSO policies on Notification for Illness or Injury and Deputy Subject to Call While Off-Duty.[83]

362.    On February 15, 2016, Braxton was suspended again for three days for violating EBRSO policies on Notification for Illness or Injury and Deputy Subject to Call While Off-Duty.[84]

363.    On August 15, 2017, Braxton was suspended again for three days, for violating EBRSO policy on Unsatisfactory Performance.[85]

364.    The suspension resulted from Braxton giving an inmate a knife without signing the knife out or ensuring that he received the knife back before shift change.[86]

365.    On April 4, 2020, Braxton used force on Plaintiff Skinner as described above.

366.    Not only did Gautreaux retain Braxton after his use of force on Skinner, but he promoted him and gave him a pay raise, even after the video of the incident became public.

367.    On April 16, 2020, the video of Braxton's use of force was made public.[87]

368.    On June 29, 2020, Sheriff Gautreaux signed a promotion letter promoting Braxton from Corporal to Sergeant, with an increase in pay from $1,897.77 to $1,973.69.

---

[80] EBRSO_000256
[81] EBRSO_000255.
[82] EBRSO 000243.
[83] EBRSO 000316.
[84] EBRS0 000315
[85] EBRSO_000235
[86] EBRSO_000237
[87] The Appeal, *"That Man Can't Breathe."* (April 16, 2020)

369.    On July 30, 2020, EBRSO concluded that "DeMarcus Braxton did Violate the following" policies: Unsatisfactory Performance, Performance of Duty, Conduct Unbecoming, Treatment of Prisoners in Custody, False Statements, and Use of Force.[88]

370.    The violations stemmed from an interaction between Braxton and an inmate in which "Braxton stated in a disciplinary report that the inmate refused medical treatment" but video footage proved that to be false.[89]

371.    The video showed Braxton "taunting and agitating an inmate that was restrained while being seen by medical personnel. Cpl. Braxton interfered during the medical assessment."[90]

372.    Braxton then escorted the inmate out of the range of video surveillance. Subsequent "video surveillance indicates the inmate had blood on the right side of his face. The inmate appeared to have been sprayed with subject control spray. The inmate appears to be disoriented and is struggling to walk After reviewing the video footage Cpl Braxton when questioned later stated  'the inmate fell on the walk.' Cpl. Braxton failed to have the inmate seen by medical and did not generate a report of this incident."[91]

373.    Braxton then used chemical spray on the inmate again, but "failed to generate any type of report or have the inmate seen by medical staff."[92]

374.    Despite this conduct, Sheriff Gautreaux retained Braxton.

375.    He chose to retain Braxton against the specific recommendation of a ranking officer, who wrote: "I recommend termination. This is [Braxton's] second such documented incident. Braxton

---

[88] EBRSO_000225.
[89] EBRSO_000226.
[90] EBRSO_000226.
[91] EBRSO_000226.
[92] EBRSO_000226.

continues to be untruthful and should not be allowed to supervise other staff nor continue to threaten inmates. He also denied medical treatment to an offender."[93]

376.    But the Sheriff did not terminate Braxton. Instead, Braxton was demoted to Deputy and suspended for seven days.[94]

377.    Then on April 3, 2020, Braxton was among officers who maced a sick inmate, Bradford Skinner, and restrained his hands and legs in shackles.  And while Mr. Skinner was exhibiting only passive resistance, three officers forcibly pressed Mr. Skinner up against a metal railing until he was choked into unconsciousness.

378.    After Braxton assaulted Skinner, Sheriff Gautreaux promoted Braxton.

379.    Then, Sheriff Gautreaux subsequently demoted Braxton, but kept him on the force despite additional violations of Treatment of Prisoners in Custody, False Statements, Use of Force, Conduct Unbecoming, Unsatisfactory Performance, and Performance of Duty.

380.    Amazingly, despite EBRSO demoting Braxton after finding he had repeatedly assaulted an inmate and lied about it, Braxton's next Performance Review found that he "meets standards" in every category and recommended him for a performance-based pay-raise.[95]

381.    The *only* suggestion made to improve Braxton's performance was that he should "conduct more proactive police work."[96]

382.    On information and belief, Gautreaux's handling of Braxton is representative of his handling of other deputies.

On information and belief, each of the EBRSO deputy defendants had a history of misconduct prior to their interactions with Plaintiffs, and each was retained on the force.

---

[93] EBRSO_000225.
[94] EBRSO_000223.
[95] EBRSO_000219 et seq.
[96] EBRSO_000221

# IV.    CLAIMS FOR RELIEF

383.    Each of the following sections incorporates all allegations of this Complaint.

## Count I – 42 U.S.C. § 1983: Unreasonable Search and Seizure, *Franks* Liability, Excessive Force, Theft of Property, and Substantive Due Process

384.    **Search and Seizure:** In terms of definitions, (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.[97]

385.    The Fourth Amendment requires that the greater the intrusion, the greater must be the reason for conducting the search.  Thus, visual body cavity searches require a higher level of suspicion than strip searches.[98]

386.    "[A]ll courts have recognized the 'severe if not gross interference with a person's privacy' that accompany visual body-cavity searches."[99]

387.    "Even when carried out in a respectful manner, and even absent any physical touching, . . .such searches are inherently harmful, humiliating, and degrading."[100]

388.    "[V]isual body cavity searches must be justified by specific, articulable facts supporting reasonable suspicion that an arrestee is secreting contraband inside the body cavity to be searched."[101]

---

[97] *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013)
[98] *Fuller v. M.G. Jewelry,* 950 F.2d 1437 (9th Cir. 1991) (body cavity search requires probable cause and warrant absent exigent circumstances); *McKinley v. Trattles,* 732 F.2d 1320 (7th Cir. 1984) (upholding damages for anal cavity search by guard); *Salinas v. Breier,* 695 F.2d 1073 (7th Cir. 1982) (must have probable cause person is hiding controlled substance in cavity).
[99] *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S.Ct. 1510, 1527 (2012) (Alito, J., concurring), citing Blackburn v. Snow, 771 F.2d 556, 564 (C.A.1 1985)
[100] *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S.Ct. 1510, 1527 (2012) (Alito, J., concurring)
[101] *Sloley v. VanBramer*, 945 F.3d 30, 33 (2d Cir. 2019).

389.    Here, each Plaintiff was subjected to at least one, and in some cases repeated, strip searches and visual body cavity searches.

390.    These searches were unreasonable in that:

a.    There was insufficient justification for initiating the search,

b.    The scope of the particular intrusion was unreasonable.

c.    The place in which the search was conducted was unreasonable,[102]

d.    The manner in which the search was conducted was unreasonable,[103]

e.    The officers lacked reasonable suspicion or probable cause to search Plaintiffs' vagina and/or anus,[104]

f.    There were no exigent circumstances requiring the search immediately on the side of the road,[105] and

g.    There was no exception to the warrant requirement for the search.[106]

391.    Furthermore, EBRSO subjected each Plaintiff to a strip and visual body cavity search when they were booked into EBRPP.

392.    For those Plaintiffs who had already been searched, this search was illegal because there could be no possible reasonable suspicion of weapons or contraband given the prior search.

393.    These searches were also illegal in that they were not directly correlated with entry into the general population of the jail.

394.    Those seizures that were without warrant or probable cause constituted unreasonable seizures.

---

[102] *United States v. Williams,* 477 F.3d 974, 977 (8th Cir. 2007); *Meeks, below*, 822 F.Supp.2d at 923 (Defendant Officers failed to avail themselves of any less intrusive alternatives to strip searching Plaintiff on a public road).
[103] *Schmidt,* 557 F.3d at 572 (citing *Bell v Wolfish,* 441 U.S. 520, 559 (1979)); *see also Meeks v. City of Minneapolis,* 822 F.Supp.2d 919, 922 (D. Minn. 2011).
[104] *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir. 1982).
[105] *Campbell v. Miller,* 499 F.3d 711, 719 (7th Cir. 2007).
[106] *Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1971); *Scott v. Harris,* 550 U.S. 372, 380-81 (2007).

395.    As a direct and proximate result of this deprivation of their constitutional rights to be free from unreasonable searches and seizures, Plaintiffs suffered injuries, both physical and emotional.

396.    ***Franks* Liability:** The "right of criminal defendants to be free from false or fabricated evidence was well settled by 1959 or earlier."[107] "Liability under *Franks* requires a certain mindset and certain conduct: an officer must intentionally, or with a reckless disregard for the truth, include a false statement in a warrant application or omit a material fact from it." *Id.* (cleaned up).

397.    Relevant here, under Franks v. Delaware, 438 U.S. 154 (1978), "an officer violates the Fourth Amendment by intentionally or recklessly including a false statement in a warrant application."[108]

398.    Here, for each of the searches and arrests of Plaintiffs that were pursuant to a warrant, on information and belief the applying officer intentionally or recklessly included false statements in the warrant application.

399.    **Excessive Force**: "To prevail on an excessive force claim, a plaintiff must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'"[109]

400.    Here, the force used on each Plaintiff was excessive given the need, including the strikes to the face and body, the excessively tight handcuffs, etc.

401.    Furthermore, any resistance by Plaintiffs was reasonable given the right to resist an unlawful arrest.[110]

---

[107] *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008).
[108] *Nerio v. Evans*, 974 F.3d 571, 577 (5th Cir. 2020).
[109] Freeman v. Gore, 483 F.3d 404, 416 (5th Cir. 2007) (Dennis, J.) (quoting Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005)).
[110] *See State v. Ceaser*, 859 So. 2d 639, 643 (2003) ("An individual in Louisiana has a time-honored right to resist an illegal arrest.").

402.    Furthermore, the strip and visual body cavity searches that took place on public roadways constituted excessive force.[111]

403.    **Theft of Property:** Defendants violated Plaintiffs' right to private property by taking their cash and SD cards without compensation.

404.    **Substantive Due Process:** The repeated strip and visual body cavity searches, the imprisonment at an off-the-books torture black site, and the non-consensual insertion of a syringe all violated Plaintiffs' rights to be free from substantive due process violations in that the conduct shocks the conscience.

## Count II – Section 1983 Conspiracy

405.    "In order to prevail on a section 1983 conspiracy claim, a plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy."[112]

406.    The individual defendants, not including Paul and Gautreaux, entered into a conspiracy to use their state powers to deprive Plaintiffs of their civil rights, when they worked together to strip-search Plaintiffs and perpetuate the other harms described herein.

## Count III - Failure to Intervene

407.    "[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citations omitted). "[A]n officer may be liable under § 1983 under [this] theory of bystander liability where the officer '(1) knows that a fellow officer is

---

[111] *See Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017) (upholding district court's finding that plaintiffs had a viable excessive force claim for a body cavity search that occurred on a public roadway).

[112] *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990); *see also Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013) ("To prove a conspiracy under § 1983, a plaintiff must allege facts that indicate (1) there was an agreement among individuals to commit a deprivation, and (2) that an actual deprivation occurred." (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994))).

violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.' " *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citations omitted).

408.    The individual defendants, not including Paul and Gautreaux, each observed their fellow officers violating Plaintiffs' constitutional rights, had a reasonable opportunity to intervene, and chose not to act.

### Count IV – *Monell* Claim (Gautreaux, Paul, and City Only)

409.    A *Monell* claim against a municipality can be established in at least eight different theories: (1) An express policy; (2) A violation by the final policymaker herself; (3) Improper hiring practices; (4) Improper retention practices; (5) Improper supervision/discipline; (6) Deficient training; (7) Pattern of misconduct; or (8) Ratification by final policymaker.

410.    A government entity and responsible officials can be held liable for the retention of officers who cause constitutional violations when a plaintiff can demonstrate "deliberate indifference" to the "known or obvious consequence[s]" of such retention decisions. *See Gomez v. Galman*, 18 F. 4th 769, 778 (5th Cir. 2021), *citing Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

411.    Deliberate indifference exists "where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to [retain] would be the deprivation of a third party's constitutional rights." *Gomez, supra, citing Gros v. City of Grand Prairie*, 209 F.3d 431, 433-34 (5th Cir. 2000) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998))

412.    Here, Plaintiffs bring a Monell claim under theories 1, 4, 5, 6, and 7:

    a.    An express policy (the unconstitutional BRPD search policy);

    b.    Improper retention practices (the choice to retain Lawrence and other officers despite repeated misconduct and violence);

    c.   Improper supervision/discipline (the complete breakdown of accountability at BRPD and EBRSO);

    d.   Deficient training (the failure to meaningfully train officers on search practices and constitutional policing); and

413.   Pattern of misconduct (the hundreds or thousands of Baton Rouge citizens abused on the streets and at the law enforcement black sites in a manner similar to Plaintiffs).

**Count V – State Law Claims: Violations of the Louisiana Constitution, False Arrest, False Imprisonment, Assault and Battery, Negligence, Negligent Hiring and Failure to Train, and IIED**

414.   **Searches and Seizures**: "In Louisiana, the right to privacy ensures that '[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy.'"[113] "Although the Louisiana Supreme Court has not articulated a clear standard for state constitutional claims alleging excessive force, 'Louisiana federal district courts have noted that principles embodied in the Fourth Amendment have been incorporated into Article I, Section 5 of the Louisiana Constitution.'"[114]

415.   **Excessive Force**: Louisiana Code of Criminal Procedure Article 220 provides, "A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." La. Code Crim. Proc. art. 220. "The use of force by law enforcement officers must be tested by the 'reasonable force' standard established by this article. The test precludes 'clearly inappropriate force.' " Kyle v. City of New Orleans, 353 So. 2d 969, 972 (La. 1977) (quoting La. Code Crim. Proc. art. 220, Official Revision Comment (b)).

---

[113] *Bagley v. Kolb,* No. 19-10, 2021 WL 3376830, at *16 (W.D. La. Aug. 3, 2021) (quoting La. Const. art. I, § 5).
[114] *Id*. (*quoting Shepherd v. City of Shreveport*, No. 14-2623, 2018 WL 1513679, at *10 (W.D. La. Mar. 27, 2018) (*citing Todd v. City of Natchitoches*, 238 F. Supp. 2d 793, 798–99 (W.D. La. 2002))).

416.    **False Arrest and False Imprisonment**: "Under Louisiana law, '[f]alse arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority.' " Elphage v. Gautreaux, 969 F. Supp. 2d 493, 514 (M.D. La. 2013) (quoting Kyle v. City of New Orleans, 353 So. 2d 969, 971 (La. 1977)).

417.    **Assault and Battery**: Defendants' non-consensual touching of Plaintiffs body, and the stripping of their clothes and Shermon's diaper, constituted assaults and batteries. The fact that Defendants stripped Plaintiffs down to their exposed genitals transforms these torts into sexual assault and sexual battery.

418.    **Negligence**: "The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under" Article 2315. *Lemann v. Essen Lane Daiquiris, Inc*., 2005-1095 (La. 3/10/06); 923 So.2d 627, 632–33 (citing *Mathieu v. Imperial Toy Corp*., 94-0952 (La. 11/30/94); 646 So. 2d. 318, 321).

419.    **Negligent Hiring, Supervision, and Training (Paul, Gautreaux, and City Only)**: Municipal employers have a duty to exercise reasonable care in the hiring, training, and supervision of its employees.  Failure to do so is a cognizable tort under Louisiana Civil Code art. 2315.

420.    **Intentional Infliction of Emotional Distress:** All persons have a duty not to take actions that will inflict severe emotional distress or be substantially certain that severe emotional distress would occur. The repeated strip and cavity searches of Plaintiffs were intended to and did cause severe emotional distress. Particularly so when those searches were in public.

421.    By the actions described above, Defendants violated each of these state law rights.

### Count VI – State Law Conspiracy

422.    "He who conspires with another person to commit an intentional or willful act is answerable,

in solido, with that person, for the damage caused by such act."[115] "Louisiana law does not create a self-standing tort of conspiracy; 'rather the actionable element of article 2324 is the intentional tort that the conspirators agreed to commit and committed, in whole or in part, causing plaintiff's injury.' "[116] That is, "[t]he actionable element of a conspiracy claim is not the conspiracy itself; rather, it is the tort that the conspirators agree to perpetrate and actually commit in whole or in part. Simply stated, the unlawful act is the tortious conduct."[117]

423.    The individual defendants, not including Paul and Gautreaux, entered into a conspiracy to use their state powers to cause tortious conduct against Plaintiffs.

### Count VII - Vicarious Liability (Paul, Gautreaux, and City Only)

424.    "At common law, the Latin phrase respondeat superior ('let the master answer') denotes the employer's liability for the employee's tort committed in the course and scope of employment."[118] "The foundation of respondeat superior is the employee's tort. Thus, where the employee was not guilty of a tort, the employer cannot be vicariously liable."[119] "Louisiana Civil Code Article 2320 codifies the concept, providing, in part: [']Masters and employers are answerable for the damage occasioned by then-servants and overseers, in the exercise of the functions in which they are employed [.][']"[120]

425.    Here, each Defendant was acting in the course and scope of their employment with regard to all the above acts.

### Count VIII – Premises Liability (Benchmark Group Only)

426.    Property owners and management companies owe a general duty to protect patrons

---

[115] La. Civ. Code. art. 2324.
[116] Snow Ingredients, Inc. v. SnoWizard, Inc., 833 F.3d 512, 526 (5th Cir. 2016) (citation omitted) (affirming dismissal of complaint on Rule 12(b)(6) grounds).
[117] *Thomas v. N. 40 Land Dev., Inc*., 2004-0610 (La. Ct. App. 4th Cir. 1/26/05); 894 So. 2d 1160, 1174 (citations omitted).
[118] 1 Frank L. Maraist, et al., Louisiana Tort Law § 13.02 (2021).
[119] Id.
[120] *Id*.

and visitors against foreseeable criminal acts.[121]

427.    Defendant Benchmark Group LLC has owned and operated the facility at 11328 Pennywood Avenue, Baton Rouge, LA 70809 at all times relevant to this lawsuit.

428.    Benchmark listed lists the Pennywood address as their domicile in its business filings with the Louisiana Secretary of State.

429.    Benchmark allows EBRSO to operate out of at least one portion of the property.

430.    On information and belief, Benchmark observed hundreds of detainees being escorted in and out of the black site facility on their property.

431.    On information and belief, Benchmark had actual or constructive knowledge of the abuses carried out at the black site on their property.

432.    On information and belief, Benchmark took no steps to stop the abuses carried out at the black site on their property.

433.    At Benchmark's property, Houston was strip-searched, denied an attorney, and intimidated by officer-Defendants.

## V.    RELIEF REQUESTED

434.    Plaintiffs request a jury on all claims.

435.    Wherefore Plaintiffs request judgment be entered against Defendant and that the Court grant the following:

   a.    Judgment against Defendants for Plaintiff's asserted causes of action;

   b.    Award of compensatory damages;

   c.    Award of special

   d.    Award of punitive damages against the individual defendants;

---

[121] *Posecai v. Wal-Mart Stores, Inc.*, 99-1222 (La. 11/30/99); *Patrick v. Employers Mut. Cas. Co.*, 99-94 (La. App. 3 Cir. 8/11/99), 745 So.2d 641.

e.  Award costs and attorney's fees;

f.  Order such other and further relief, at law or in equity, to which Plaintiff may be justly

entitled.

Respectfully submitted,

/s/ *William Most*
William Most, La. Bar No. 36914
Dave Lanser, La. Bar No. 37764
Most & Associates
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
(504) 509-5023
williammost@gmail.com