# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

HOUSTON LAWRENCE, ET AL.                    CIVIL ACTION

VERSUS

CITY OF BATON ROUGE/PARISH OF            NO. 23-01508-BAJ-SDJ
EAST BATON ROUGE, ET AL.

## RULING AND ORDER

Before the Court is Defendants East Baton Rouge Parish Sheriff Sid J. Gautreaux, III, Chad Felps, Tanner Jenkins, Eno Guillot, James Cooper, and N. Dartez's ("Sheriff Defendants") **Motion to Dismiss and in the Alternative Motion to Strike (Doc. 34).** Plaintiffs oppose the Motion. (Doc. 73). The Sheriff Defendants filed a Reply Brief. (Doc. 74). For the following reasons, the Sheriff Defendants' Motion will be **DENIED**.

## I.    FACTUAL BACKGROUND

This case arises out of an alleged series of illegal strip-searches, false arrests, thefts, unconstitutional interrogations, and the use of excessive force at three law enforcement black sites, including the "BRAVE Cave." (Doc. 1, ¶ 1). "BRAVE" is an acronym for "Baton Rouge Area Violence Elimination." (*Id.* at ¶ 38). The BRAVE team was the "Street Crimes" or "Violent Crime Enforcement" unit of the Baton Rouge Police Department ("BRPD"). (*Id.* at ¶ 39). Plaintiffs Carrie Mealey and Houston Lawrence "now sue for accountability and justice for how they were treated." (*Id.* at ¶ 5).

Plaintiffs filed this lawsuit against the City of Baton Rouge and the Parish of East Baton Rouge (the "City/Parish"), Benchmark Group, LLC (the owner of the building where several incidents allegedly occurred), and officers from the East Baton Rouge Sheriff's Office ("EBRSO") and Baton Rouge Police Department ("BRPD").[1] Officers named as Defendants include BRPD Officer Troy Lawrence, Jr., and the following members of the EBRSO: (1) Sheriff Sid J. Gautreaux, III; (2) Chad Felps; (3) Tanner Jenkins; (4) Eno Guillot; (5) James Cooper; (6) N. Dartez; and (7) Tafari Beard.[2] (*Id.* at ¶¶ 10–24).

Plaintiffs also name Doe Defendants 1–20 as "persons presently unknown to have contributed to [Plaintiffs' allegations] after Plaintiffs' diligent search and inquiry." (*Id.* at ¶ 23). Plaintiffs contend that Doe Defendants 1–20 were "officers present at one of the three law enforcement black sites described [in the Complaint] when Plaintiffs were imprisoned, searched, and interrogated there." (*Id.* at ¶ 24).

Finally, Plaintiffs name ABC Insurance Company Defendants 1–10 as "not-yet-identified insurance companies that hold polices which cover any or all of the co-Defendants for the actions alleged herein." (*Id.* at ¶ 27).

The Sheriff Defendants, which include Gautreaux, Felps, Jenkins, Guillot, Cooper, and Dartez, now move to strike certain allegations in Plaintiffs' Complaint. (Doc. 34). The Sheriff Defendants also move to dismiss Plaintiffs' claims in their

---

[1] The Court dismissed BRPD Chief Murphy Paul from this case on an Unopposed Motion to Dismiss Paul from the case. (Doc. 44; Doc. 75).

[2] The Sheriff Defendants argue that Beard is a member of BRPD and not EBRSO. Plaintiffs should address this discrepancy when amending their Complaint, as described below.

entirety. (*Id.*). For the purposes of the Sheriff Defendants' Motion to Dismiss, the Court accepts the following allegations as true, as the law requires at this stage of the litigation. *See Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (When conducting its inquiry, the Court must "accept[] all well pleaded facts as true and view[] those facts in the light most favorable to the plaintiff.").

### A. May 13, 2022 Interaction Involving Plaintiff Carrie Mealey and her Son Shermon Mealey.

Plaintiff Carrie Mealey ("Mealey") is sixty-eight years old. (Doc. 1 ¶ 3). Her son Shermon Mealey ("Shermon") is paraplegic, paralyzed from the waist down. (*Id.* at ¶¶ 29–30). On May 13, 2022, BRPD officers pulled Shermon out of his car at a gas station and handcuffed him. (*Id.*). Officers placed Shermon in a rolling office chair, and then loaded Shermon into a BRPD vehicle. (*Id.* at ¶¶ 33–34). While loading Shermon into the BRPD vehicle, officers dropped Shermon heavily to the ground. (*Id.* at ¶ 35). Officers then took Shermon to a warehouse near Plank Road, colloquially termed the "BRAVE Cave." (*Id.* at ¶ 37).

At the BRAVE Cave, officers fingerprinted and strip-searched Shermon. (*Id.* at ¶¶ 51–52). Officers also subjected Shermon to a visual body cavity search. (*Id.* at ¶ 53). Because Shermon is paralyzed, he wears adult diapers. (*Id.* at ¶ 54). During the strip-search, officers removed Shermon's diaper and exposed his genitalia. (*Id* at ¶ 55). Because he cannot feel below the waist, Shermon does not know if officers engaged in a penetrative cavity search. (*Id.* at ¶ 56). Shermon was interrogated at the BRAVE Cave. (*Id.* at ¶ 57).

Officers then transported Shermon to the East Baton Rouge Parish Prison ("EBRPP"), where they booked him for alleged crimes. (*Id.* at ¶ 58). At EBRPP, Shermon was subjected to another visual body cavity search. (*Id.* at ¶ 59). Officers knew Shermon would be subjected to another strip-search when they booked him into EBRPP. (*Id.* at ¶ 60). The District Attorney "no-billed" every charge against Shermon, and Shermon was released from EBRPP. (*Id.* at ¶¶ 62–63).

## B. June 28, 2023 Interaction Involving Plaintiff Carrie Mealey and her Son Shermon Mealey.

On June 28, 2023, BRPD officers raided Mealey's home. (*Id.* at ¶ 64). Officers used the BRPD Bearcat vehicle, a militarized armored truck, for the raid. (*Id.* at ¶ 66). Officers stated that they possessed a warrant for the raid but failed to show the warrant to Mealey. (*Id.* at ¶ 67).

During the search of Mealey's home, officers once again detained Shermon. (*Id.* at ¶¶ 68–69). Officers removed Shermon from his wheelchair and handcuffed him. (*Id.* at ¶ 69). Officers used so much force to handcuff Shermon that they injured his wrists and arms. (*Id.* at ¶ 70).

Officers transported both Shermon and Mealey to the BRAVE Cave. (*Id.* at ¶ 71). At the BRAVE Cave, officers performed another visual body cavity search of Shermon, removing his diaper and exposing his genitalia. (*Id.* at ¶ 72). Officers again interrogated Shermon. (*Id.* at ¶ 73).

Officers then transported Shermon to EBRPP, where they booked him for alleged crimes. (*Id.* at ¶ 77). Shermon was subjected to a visual cavity search at

EBRPP. (*Id.* at ¶ 84). While at EBRPP, Shermon asked for medical attention, and was instead placed in punitive solitary confinement. (*Id.* at ¶ 86).

Officers placed tight handcuffs on Mealey, causing her extreme pain and welts on her wrists that lasted for months. (*Id.* at ¶ 74). Officers also interrogated Mealey. (*Id.* at ¶ 75). Officers took Mealey to urgent care and then transported her to EBRPP. (*Id.* at ¶¶ 78–79). At EBRPP, Mealey was subjected to a visual cavity search, involving squatting and coughing. (*Id.* at ¶ 83).

Officers booked Mealey for alleged crimes, including obstruction of justice, illegally supplying a felon with ammunition, and illegally supplying a felon with a firearm. (*Id.*). Mealey was charged with "obstruction of justice" because Mealey requested that BRPD return her firearms and BRPD returned Mealey's firearms, apparently in error. (*Id.* at ¶¶ 80–82).

Once again, the district attorney "no-billed" every charge against both Shermon and Carrie Mealey. (*Id.* at ¶ 85).

## C. 2019 Interactions Involving Plaintiff Houston Lawrence.

Plaintiff Houston Lawrence also allegedly had problematic interactions with the BRPD and the EBRSO. In 2019, Lawrence was handcuffed and taken to a BRPD/EBRSO black site. (*Id.* at ¶¶ 80–89). At the black site, BRPD officers interrogated Lawrence and allegedly stole his money. (*Id.* at ¶¶ 92–93). Officers never returned Lawrence's money to him or logged the money into evidence. (*Id.* at ¶ 94). Officers eventually released Lawrence without booking him into EBRPP. (*Id.* at ¶ 95).

Later in 2019, BRPD officers again encountered Lawrence. He was again handcuffed, and this time transported to the BRAVE Cave. (*Id.* at ¶¶ 96–97). At the BRAVE Cave, officers strip-searched and interrogated Lawrence. (*Id.* at ¶ 98). Officers again released Lawrence without booking him into EBRPP. (*Id.* at ¶ 99).

**D. April 21, 2022 Interaction Involving Plaintiff Houston Lawrence.**

On April 21, 2022, BRPD and EBRSO officers, including Chad Felps and Eno Guillot, raided Lawrence's home. (*Id.* at ¶¶ 100–102). While they raided his home, officers handcuffed Lawrence and made him wait outside. (*Id.* at ¶ 103).

Lawrence's girlfriend heard officers conducting the search say, "any money you find, keep it. Free money." (*Id.* at ¶ 104). Lawrence had approximately $15,000 in cash at his home, all of which was allegedly taken by the officers. (*Id.* at ¶ 105). Officers only reported seizing $7,601. (*Id.* at ¶ 106).

Although Lawrence had surveillance cameras in his home, he was unable to secure the footage of the raid because officers took the SD cards from the system. (*Id.* at ¶ 107).

Officers then transported Lawrence to a black site believed to be the BRAVE Cave, including the following officers: (1) Troy Lawrence, Jr.[3]; (2) Felps; (3) Jenkins; and (4) Guillot. (*Id.* at ¶¶ 109–112). Officers placed a bag over Lawrence's head while he was transported to the black site. (*Id.* at ¶ 114). In the vehicle, officers allegedly used force on Houston and asked him questions. (*Id.* at ¶ 115).

---

[3] For ease of reference, Troy Lawrence, Jr. will be referred to as "Lawrence, Jr." in this Ruling and Order, while Houston Lawrence will be referred to as simply "Lawrence."

Once at the black site, officers strip-searched Lawrence and made him squat and cough while nude. (*Id.* at ¶ 118). Officers then handcuffed Houston to a table. (*Id.* at ¶ 119). Lawrence requested to speak to an attorney, but officers refused and continued interrogating him. (*Id.* at ¶ 120). Officers also allegedly injected a milky white substance into Lawrence with a syringe. (*Id.* at ¶ 121). Officers beat Lawrence so badly that they cut and bruised his body and tore his right rotator cuff. (*Id.* at ¶ 123).

Because Lawrence did not give the officers the information they were seeking, officers brought Lawrence's girlfriend to the BRAVE Cave and threatened to arrest her. (*Id.* at ¶ 124). Lawrence's girlfriend was detained and placed into handcuffs. (*Id.* at ¶ 125). Lawrence was then transported and booked into EBRPP, where he was strip-searched once more. (*Id.* at ¶¶ 126–28). Lawrence received no medical attention, despite his manifest injuries. (*Id.* at ¶ 130).

**E. October 20, 2022 Interaction Involving Plaintiff Houston Lawrence.**

Several months later, in July 2022, Lawrence was released on bond. (*Id.* at ¶ 130). On October 20, 2022, officers from the BRPD and EBRSO, including Tanner Jenkins, Chad Felps, Troy Lawrence, Jr., N. Dartez, and James Cooper, raided Lawrence's apartment once more. (*Id.* at ¶ 131). Officers again arrested Lawrence. (*Id.* at ¶ 132).

Lawrence allegedly had $3,500 in cash on his person at the time, which officers again confiscated. (*Id.* at ¶¶ 133–34). The officers only booked $185 into evidence. (*Id.* at ¶ 134). In the street outside Houston's home, officers searched Houston,

pulling down his pants and undershorts to his knees and exposing his genitals. (*Id.* at ¶¶ 135–36).

Officers then took Houston to a different black site. (*Id.* at ¶ 137). Officers referred to this black site in the police report as the "EBRSO Narcotics office," although it is owned and operated by Defendant Benchmark Group, LLC. (*Id.* at ¶¶ 141–42).

At the black site, officers subjected Lawrence to another strip-search and visual body cavity search. (*Id.* at ¶ 144). Lawrence requested to speak with an attorney, but the officers continued interrogating him. (*Id.* at ¶ 146).

Felps allegedly told Lawrence that officers "need[ed] keys or a dead body." (*Id.* at ¶ 147). Jenkins told Lawrence that he was a federal agent, and that he gets paid good money to "keep assholes like Houston [Lawrence] off the street." (*Id.* at ¶ 148). Jenkins is actually an EBRSO captain, not a federal officer. (*Id.* at ¶ 149).

After interrogating Lawrence, officers again took him to EBRPP and booked him. (*Id.* at ¶ 151). Officers strip-searched Lawrence at EBRPP. (*Id.* at ¶ 153). Officers did not document any of the strip or cavity searches. (*Id.* at ¶ 156).

### F. BRPD and EBRPSO Policies.

BRPD policy allows for arrestees to be strip-searched in instances where the officer has "articulate, reasonable suspicion that this particular arrestee may have weapons or contraband on his person." (*Id.* at ¶ [*sic.*] 32). Reasonable suspicion is based on the following factors:

(1) The nature of the offense charged.

8

(2) The arrestee's appearance and conduct.

(3) The circumstances of the arrest.

4) The arrestee's prior record.

(*Id.* at ¶ [*sic.*] 32). BRPD also allows strip-searches of non-arrestees on reasonable suspicion. (*Id.* at ¶ 157).

The mechanics of a strip-search are far different than a usual frisk. (*See id.* at p. 17). A strip-search involves a "visual inspection of an individual who has disrobed including the hair, mouth, ears, nostrils, groin area and buttocks to locate weapons, contraband or evidence." (*Id.* at ¶ 160). A frisk is simply a "pat down of the outer garments specifically for weapons." (*Id.* at ¶ 159).

EBRPSO has its own search and seizure policy. (*Id.* at ¶ 163). It states, in totality, that: "All seizures by this office will comply with relevant federal and state law governing the seizure of persons and property," and that because "case law regarding search and seizure is constantly changing and subject to interpretation by the courts, each member of this office is expected to act in each situation according to current training and his/her familiarity with clearly established rights as determined by case law." (*Id.* at ¶ 165).

## G. History of Misconduct within BRPD and EBRPSO.

In 2021, BRPD officers' use of strip-searches became a national news story. (*Id.* at ¶ 167). In 2021, BRPD strip-searched a man named Clarence Green and his juvenile brother. (*Id.*). The blowback from this story led to policymakers at the BRPD conducting a news conference affirming the conduct of the BRPD officers, clearing

said officers of any wrongdoing, and seeking to imprison the attorney who released the video to the public. (*Id.* at ¶¶ 168–173).

Plaintiffs allege that strip-searches and black sites are used as a matter of course by officers with the BRPD and the EBRPSO. (*Id.* at 19). Plaintiffs note that local news outlets have released additional bodycam footage from Troy Lawrence, Jr. within one of these black sites, where Lawrence, Jr., allegedly without reasonable suspicion or probable cause, violently strip-searched Jeremy Lee. (*Id.* at ¶ 183). Lawrence, Jr. told Lee that he was "about to beat the living crap out of you." (*Id.* at ¶ 185). Lawrence, Jr. allegedly proceeded to take Lee to a holding cell and beat him severely. (*Id.* at ¶ 187).

Lee suffered injuries of such a degree that EBRPP refused to accept him upon transfer, and insisted that he be immediately taken to a hospital. (*Id.* at ¶ 189). Lee's ribs were broken, in addition to other physical injuries. (*Id.* at ¶ 190).

Lawrence, Jr. and BRPD Officer David Wallace then allegedly created a false police report to cover their tracks, claiming that Lee committed a battery against Lawrence, Jr., and that he attempted to escape the black site. (*Id.* at ¶¶ 191–92).

Lawrence, Jr.'s alleged misdeeds continued. On June 10, 2023, BRPD officers, including Lawrence, Jr., performed a traffic stop on Ternell Brown and her husband. (*Id.* at ¶ 193). Officers allegedly searched the Browns' vehicle without warrant or consent. (*Id.*). Officers found only prescription medication in Brown's lawful possession. (*Id.*). Officers took Brown to the BRAVE Cave, where they subjected her to a strip and body cavity search. (*Id.*). BRPD officers allegedly forced Brown to spread

10

her vagina and buttocks for inspection, and examined her vagina using a flashlight. (*Id.* at ¶ 194). Officers released Brown without charge. (*Id.* at ¶ 195).

Several internal affairs complaints were lodged against Lawrence, Jr. and related officers' misconduct at the black sites in 2023. (*Id.* at ¶ 196). BRPD did not take action until renewed media attention in September 2023. (*Id.* at ¶ 197). In response to public outcries, the BRAVE Cave was shuttered, and Lawrence, Jr. was forced out of the BRPD. (*Id.*). Then-Chief Murphy Paul acknowledged that the issues arising from those officers' conduct were not rooted in individual faults, but with the "patterns and practices" of the BRPD Street Crime unit. (*Id.* at ¶ 210).

Zooming further out, Plaintiffs indicate that the current case is the latest swell in a decades-long current within the BRPD towards excessive force and a lack of accountability. (*Id.* at 23). Plaintiffs allege that as far back as September 2005, assisting law enforcement agencies were repulsed by the misconduct of BRPD officers. (*Id.* at ¶¶ 217–220). Plaintiffs cite a news article wherein a Michigan State Police spokeswoman allegedly told a reporter that their "troopers observed Baton Rouge police officers engage in actions that were an affront to their sense of dignity and respect." (*Id.* at ¶ 218). These sentiments were echoed in a formal letter of complaint issued by the Michigan State Police and the New Mexico State Police to the BRPD. (*Id.* at ¶ 219).

These opinions are not confined to external sources. In 2011, Plaintiffs allege that then-BRPD Chief Dewayne White stated that, in his opinion, *one in ten* BRPD

officers fail to exercise basic levels of professionalism, and assume criminality on the basis of skin color. (*Id.* at ¶ 225). White was subsequently fired. (*Id.*).

The Complaint is replete with allegations that the BRPD, and by extension the City of Baton Rouge, has allowed law enforcement officials to operate in unconstitutional and insidious ways. (*Id.* at 25–27, 30 (detailing instances of BRPD officers engaging in acts of explicit racism, excessive force, unprompted searches and seizures, and unjustified arrests)). Plaintiffs also point to former BRPD deputy chief Carl Dunn's statements to various news publications, along with statistics released by the BRPD itself, asserting that there was no meaningful self-investigation of misconduct at BRPD prior to the events underlying Plaintiffs' Complaint. (*Id.* at 28, 32). Additionally, Defendant Lawrence, Jr.'s misconduct and temperament have been known to BRPD officials for years. (*Id.* at 35–42).

Plaintiffs allege that the EBRPSO has similarly failed to clothe itself in honor, referencing the allegations in several cases currently or previously before this Court as proof. (*Id.* at 27). Plaintiffs cite to instances of misconduct by EBRPSO officials, including the use of excessive force, which resulted in minimal punishment for offending officers. (*Id.* at 42–46).

In short, Plaintiffs allege that the cultures of both the BRPD and the EBRPSO are rotten, and that the treatment each received at the hands of responding officers were the natural result of widespread trends and practices. (*See generally* Doc. 1).

## II.    PROCEDURAL HISTORY

Plaintiffs bring eight causes of action in their Complaint. (Doc. 1).

First, Plaintiffs bring claims under 42 U.S.C. § 1983 for unreasonable search and seizure, *Franks* liability, excessive force, theft of property, and violations of substantive due process (Count I, Section 1983 claims). (*Id.* at 47).

Second, Plaintiffs claim that Defendants conspired to deprive them of their civil rights (Count II, Section 1983 conspiracy). (*Id.* at 50).

Third, Plaintiffs allege that individual Defendants, not including Defendant Gautreaux, observed their fellow officers violate Plaintiffs' constitutional rights, and failed to intervene (Count III, failure to intervene). (*Id.* at 50–51).

Fourth, Plaintiffs assert a claim for municipal liability against the City/Parish for BRPD and EBRPSO's unconstitutional search policies, improper retention practices, improper supervision/discipline, deficient training, and pattern of misconduct (Count IV, *Monell* claim against Gautreaux and City only).[4] (*Id.* at 51–52).

Fifth, Plaintiffs bring state law claims for violations of the Louisiana Constitution, false arrest, false imprisonment, assault, battery, negligence, negligent hiring and failure to train, and intentional infliction of emotional distress (Count V, state law claims). (*Id.* at 53).

Sixth, Plaintiffs assert that Defendants are jointly liable for a conspiracy to commit the listed state law violations (Count VI, state law conspiracy). (*Id.* at 54).

---

[4] Plaintiffs also asserted this claim against Paul, who has been dismissed from this case.

Seventh, Plaintiffs contend that Defendant Gautreaux and the City/Parish are responsible according to the theory of vicarious liability (Count VII, vicarious liability against Paul, Gautreaux, and City). (*Id.*).

Eighth, Plaintiffs allege that Defendant Benchmark Group, LLC is liable under the theory of premises liability for the actions of other Defendants at the alleged black site purportedly owned by Benchmark (Count VIII, premises liability against Benchmark Group). (*Id.* at 55).

The Sheriff Defendants have since filed the Motion presently before the Court. (Doc. 34). In it, the Sheriff Defendants request that the Court dismiss Plaintiffs' claims against them and/or strike the portions of Plaintiffs' Complaint related to Shermon Mealey. (Doc. 34-1). For the following reasons, the Sheriff Defendants' Motion (Doc. 34) is **DENIED.**

### III.   LEGAL STANDARD

#### A. Motion to Strike.

Federal Rule of Civil Procedure 12(f) allows the Court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A motion to strike under Rule 12(f) "is a drastic remedy to be resorted to only when required for the purposes of justice." *Augustus v. Bd. of Pub. Instruction of Escambia Cty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962); *see also Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) ("[M]otions to strike a defense are generally disfavored, . . ."); *Synergy Mgmt., LLC v. Lego Juris A/S*, No. 07-5892,

2008 WL 4758634, at *1 (E.D. La. Oct. 24, 2008) ("Motions to strike made under Rule 12(f) are viewed with disfavor by the federal courts, and are infrequently granted."). A motion to strike should be granted only when "the allegations are prejudicial to the defendant or immaterial to the lawsuit." *Johnson v. Harvey*, No. 96-3438, 1998 WL 596745, at *7 (E.D. La. Sept. 8, 1998) (internal quotation omitted). Immateriality is established by showing that the challenged allegations "can have no possible bearing upon the subject matter of the litigation." *Bayou Fleet P'ship v. St. Charles Parish*, No. 10-1557, 2011 WL 2680686, at *5 (E.D. La. July 8, 2011) (internal quotation omitted); *see also Greater New Orleans Fair Hous. Action Ctr. v. Kelly*, 364 F. Supp. 3d 635, 655–56 (E.D. La. 2019).

## B. Motion to Dismiss.

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

15

that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). When conducting its inquiry, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quotation marks omitted).

To overcome a qualified immunity defense, a plaintiff must satisfy a "two-prong test," which consists of showing (1) a constitutional violation under current law, and (2) that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). In assessing a defendant's conduct under this test, the central concept is one of "fair warning," or that the defendant was given reasonable warning that the conduct alleged violated constitutional rights. *Id.* (quoting *Kinney v. Weaver*, 367 F.3d 337, 349–50 (5th Cir. 2004) (en banc)).

## IV.   DISCUSSION

The Sheriff Defendants ask the Court to strike the allegations in Plaintiffs' Complaint relating to Shermon's arrest and incarceration from the record. (Doc. 34-1 at 59). The Sheriff Defendants also ask the Court to dismiss Plaintiffs' claims against them. (*Id.*). The Court will address the Sheriff Defendants' Motion to Strike first, followed by the Motion to Dismiss.

**A. Motion to Strike.**

The Sheriff Defendants ask the Court to strike Plaintiffs' allegations regarding Shermon Mealey. (Doc. 34-1 at 8). The Sheriff Defendants argue that these allegations are immaterial and prejudicial because Shermon Mealey is not a named Plaintiff and has "no possible relation" to Plaintiffs' claims. (*Id.*). Plaintiffs respond that these allegations are "inextricably tied" to the facts and circumstances surrounding Plaintiff Carrie Mealey's claims. (Doc. 73 at 4).

Federal Rule of Civil Procedure 12(f) allows the Court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A motion to strike under Rule 12(f) "is a drastic remedy to be resorted to only when required for the purposes of justice." *Augustus v. Bd. of Pub. Instruction of Escambia Cty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962); *see also Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) ("[M]otions to strike a defense are generally disfavored, . . ."); *Synergy Mgmt., LLC v. Lego Juris A/S*, No. 07-5892, 2008 WL 4758634, at *1 (E.D. La. Oct. 24, 2008) ("Motions to strike made under Rule 12(f) are viewed with disfavor by the federal courts, and are infrequently granted."). A motion to strike should be granted only when "the allegations are prejudicial to the defendant or immaterial to the lawsuit." *Johnson*, 1998 WL 596745, at *7 (internal quotation omitted). Immateriality is established by showing that the challenged allegations "can have no possible bearing upon the subject matter of the litigation." *Bayou Fleet P'ship v. St. Charles Parish*, No. 10-1557, 2011 WL 2680686,

at *5 (E.D. La. July 8, 2011) (internal quotation omitted); *see also Kelly*, 364 F. Supp. at 655–56. This Court has held that "district courts enjoy considerable discretion in ruling on a motion to strike." *Spoon v. Bayou Bridge Pipeline, LLC*, 335 F.R.D. 468, 470 (M.D. La. 2020).

The Court exercises it discretion to decline to strike the allegations regarding Shermon Mealey at this stage in the litigation. Although Shermon Mealey is not a named plaintiff, the allegations are potentially relevant to Plaintiffs' claims for municipal liability at the very least, which requires a showing of deliberate indifference. *Kador o/b/o Willis v. Gautreaux*, No. 23-CV-11-SDD-RLB, 2024 WL 1261897, at *16 (M.D. La. Mar. 25, 2024) (citing *Hankins v. Wheeler*, No. 211129, 2022 WL 2208848, at *7 (E.D. La. June 21, 2022); *Ratliff v. Aransas Cnty., Tex.*, 948 F.3d 281, 285 (5th Cir. 2020)). Deliberate indifference can be demonstrated through a "pattern of similar violations at the time the plaintiff's own rights were violated." *Kador*, 2024 WL 1261897, at *16 (citing *Robles v. Ciarletta*, 797 F. App'x 821, 833–34 (5th Cir. 2019)). Thus, at this early stage of the litigation, the Court cannot find that the allegations regarding Shermon Mealey have "no possible bearing" on this case. The Sheriff Defendants' Motion to Strike (Doc. 34) is **DENIED.**

### B. Motion to Dismiss.

The Sheriff Defendants argue that dismissal is warranted because: (1) Plaintiffs' Complaint violates the pleading requirements of Federal Rule of Civil Procedure 8; (2) EBRSO was not involved in Mealey's arrest; (3) several of

Plaintiffs' claims are prescribed; and (4) Plaintiffs fail to allege sufficient facts to state a claim regarding Lawrence's October 2022 arrest. (Doc. 34-1 at 1–2). The Court will begin with whether Plaintiffs have satisfied the pleading standards set forth in Rule 8.

### i.  Federal Rule of Civil Procedure 8 Pleading Standards.

The Sheriff Defendants argue that Plaintiffs' Complaint is a "shotgun" pleading that fails under Federal Rule of Civil Procedure 8. Under Rule 8, a Complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 10 mandates that "[a] party must state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). "Complaints that run afoul of these Rules are often disparagingly referred to as 'shotgun pleadings.'" *O'Neal v. Universal Prot. Serv., LLC*, No. 21-737, 2022 WL 1631970, at *5 (M.D. La. May 23, 2022) (quoting *In re Ozcelebi*, 635 B.R. 467, 471 (Bankr. S.D. Tex. 2021) (internal quotations omitted)). Courts have identified the following four types of "shotgun pleadings":

> The first is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to a combination of the entire complaint. This leads to a situation where most of the counts contain irrelevant factual allegations and legal conclusions. Second, . . . a shotgun pleading occurs when a complaint is full of conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading . . . is a complaint that fails to separate into a different count each cause of action or claim for relief. This type of shotgun pleading violates Rule 10(b). Finally, the fourth type of shotgun pleading . . . is a complaint which includes multiple claims against multiple defendants without

specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Perkins v. Foremost Ins. Co. Grand Rapids, Michigan*, No. CV 23-910-SDD-SDJ, 2024 WL 4524166, at *2 (M.D. La. July 19, 2024) (internal citations omitted). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* (internal citations omitted).

Here, the Sheriff Defendants argue that Plaintiffs' Complaint is a shotgun pleading for two reasons. First, the Sheriff Defendants argue that Plaintiffs' Complaint is replete with "conclusory, vague[,] and immaterial facts" not connected to any particular cause of action. (Doc. 34-1 at 9). Specifically, the Sheriff Defendants take issue with the allegations regarding Shermon Mealey, which the Court has already addressed and need not address again. (*See id.*).

Second, the Sheriff Defendants argue that Plaintiffs' claims are vague. (*Id.*). The Sheriff Defendants contend that Plaintiffs do not clarify which alleged facts support which claim. (*Id.* at 9–10). The Sheriff Defendants also argue that Plaintiffs' Complaint does not identify which Defendant is responsible for which act or omission. (*Id.* at 11).

A review of Plaintiffs' Complaint shows that although it is replete with factual allegations, totaling 435 paragraphs, it is unclear which Plaintiff alleges which claim or whether both Plaintiffs allege each claim collectively. Some of Plaintiffs' claims refer to "Plaintiffs," purportedly indicating that both Plaintiffs assert the claim at

issue. (Doc. 1 at 47–55). Other claims do not reference a particular Plaintiff or Plaintiffs at all. (*Id.*).

Additionally, it is unclear which claim is asserted against which Defendant or Defendants. There are several entity Defendants and several individually named Defendants in this case. Some of Plaintiffs' claims indicate that they are asserted against particular Defendants, while other claims make no such reference. For example, the Court has provided the titles of each of Plaintiffs' claims as outlined in the Complaint below:

**Count I – 42 U.S.C. § 1983: Unreasonable Search and Seizure, *Franks* Liability, Excessive Force, Theft of Property, and Substantive Due Process**

**Count II – Section 1983 Conspiracy**

**Count III - Failure to Intervene**

**Count IV – *Monell* Claim (Gautreaux, Paul, and City Only)**

**Count V – State Law Claims: Violations of the Louisiana Constitution, False Arrest, False Imprisonment, Assault and Battery, Negligence, Negligent Hiring and Failure to Train, and IIED**

**Count VII - Vicarious Liability (Paul, Gautreaux, and City Only)**

**Count VIII – Premises Liability (Benchmark Group Only)**

Presumably, if Plaintiffs did not reference any particular Defendant in the claim at issue, then Plaintiffs assert the claim at issue against all Defendants, but Defendants

are entitled to greater clarity. Under Rule 8, Defendants are plainly entitled to notice of the claims against them and the grounds on which each claim stands.

Finally, some of Plaintiffs' claims indicate which facts underpin the claim at issue, and some do not. For instance, Plaintiffs' (or Plaintiff's) state law negligence claim merely provides:

> **Negligence**: "The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under" Article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So.2d 627, 632–33 (citing *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94); 646 So. 2d. 318, 321).

(Doc. 1 at 53). Plaintiffs' articulation of the legal standard for negligence is insufficient for the Court or Defendants to ascertain which act or omission was allegedly negligent, which Defendants were allegedly negligent, and which Plaintiff(s) suffered damages from Defendants' alleged negligence.

Although Plaintiffs' Complaint fails to meet the pleading standards required by Rule 8, a "Complaint should only be dismissed under Rule 12(b)(6) after affording ample opportunity for the plaintiff to state a claim upon which relief can be granted, unless it is clear amendment would be futile." *Bauer v. AGCO Corp.*, 770 F. Supp. 3d 957, 962 (W.D. Tex. 2025) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Hitt v. City of Pasadena*, 561 F.2d 606, 608–09 (5th Cir. 1977); *DeLoach v. Woodley*, 405 F.2d 496, 496–97 (5th Cir. 1968)). Consequently, when it appears a more careful or detailed drafting might overcome the deficiencies on which dismissal is sought, a Court must allow a plaintiff the opportunity to amend the Complaint. *Bauer*, 770 F. Supp. 3d at 962 (citing *Hitt*, 561 F.2d at 608–09). A court may

appropriately dismiss an action with prejudice without giving an opportunity to amend if it finds the plaintiff alleged his best case or if amendment would be futile. *Bauer*, 770 F. Supp. 3d at 962 (citing *Foman*, 371 U.S. at 182; *DeLoach*, 405 F.2d at 496–97).

Federal Rule of Civil Procedure Rule 15(a)(2) provides: "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Courts have liberally construed Rule 15(a)(2) in favor of amendment. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. 1981) ("the liberal position of the federal rules on granting amendments . . . evinces a bias in favor of granting leave to amend"). The decision to grant leave is within the sound discretion of the court. *Louisiana v. Bank of Am. Corp.*, No. CV 19-638-SDD-SDJ, 2020 WL 3966875, at *2 (M.D. La. July 13, 2020).

Here, the Court exercises its discretion to permit Plaintiffs to amend their Complaint within 21 days of the issuance of this Ruling and Order. *See Ibrahim v. Bernhardt*, No. 19-CV-00101, 2020 WL 94877, at *6 (E.D. La. Jan. 8, 2020) ("As such, the Court will strike the [p]laintiff['s] complaint while still providing the [p]laintiff an opportunity to file an amended complaint that complies with the Federal Rules of Civil Procedure and this Court's directives.") (citing *Jiggetts v. D.C.*, 319 F.R.D. 408, 413–14 (D.D.C. 2017), *aff'd sub nom. Cooper v. D.C.*, No. 17-7021, 2017 WL 5664737 (D.C. Cir. Nov. 1, 2017) ("When a trial court concludes that an initial complaint fails to satisfy Rule 8, an appropriate remedy is to strike the complaint . . . and to provide the plaintiff with an opportunity to file an amended complaint that complies with the

23

Rules.")). Although the Court's policy is to decide "cases on the basis of substantive rights rather than technicalities," Defendants are entitled to sufficient notice of the claims against them and the grounds for those claims under Rule 8, which is lacking here. *See Hines v. Wainwright,* 539 F.2d 433, 434 (5th Cir. 1976) (stating that the federal policy is to decide "cases on the basis of substantive rights rather than technicalities was determinative").

The allegations in Plaintiffs' Complaint are quite egregious, and the Court finds it unlikely that an amendment would be futile. Plaintiffs have not yet amended their Complaint. The Magistrate Judge stayed discovery pending the Court's Ruling on the instant Motion; thus, discovery is not yet underway. (Doc. 64; Doc. 70). Accordingly, Defendants will not be prejudiced by this amendment.

To cure any potential prejudice, however, the Court will require Plaintiffs to amend their Complaint in the following manner. Plaintiffs may freely amend Section IV of their Complaint titled "Claims for Relief" in accordance with this Ruling and Order. Plaintiffs may amend Section III of their Complaint, titled "Parties," to add greater specificity regarding the named parties, if desired. Plaintiffs shall not, however, amend their "Statement of Facts," paragraphs 29–382, *except* to indicate, if desired, which cause of action the paragraph pertains to. Plaintiffs have exhaustively detailed the facts at issue. Plaintiffs simply must make it clear which facts relate to which claims, which claim is asserted by which Plaintiff(s), and which claim is asserted against which Defendant(s).

ii.    **Defendants' Remaining Arguments.**

Because the Court finds that greater clarity is required such that Plaintiffs must amend their Complaint, the Court will deny the remainder of Defendants' Motion to Dismiss without prejudice to the right to re-urge those arguments in the normal course following Plaintiffs' Amended Complaint

V.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that the Sheriff Defendants' **Motion to Strike (Doc. 34)** is **DENIED.**

**IT IS FURTHER ORDERED** that the Sheriff Defendants' **Motion to Dismiss (Doc. 34)** Plaintiffs' Complaint for failure to adhere to pleading standards under Federal Rule of Civil Procedure 8 is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs shall **AMEND** their Complaint within 21 days of the issuance of this Ruling and Order.

**IT IS FURTHER ORDERED** that all other aspects of the Sheriff Defendants' **Motion to Dismiss (Doc. 34)** is **DENIED WITHOUT PREJUDICE** to the right to re-urge their arguments in the normal course after Plaintiffs' amendment of their Complaint.

Baton Rouge, Louisiana, this 30th day of September, 2025

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**